[No. S051417. Feb. 27, 1997.]

ABC INTERNATIONAL TRADERS, INC., Plaintiff and Appellant, v. MATSUSHITA ELECTRIC CORPORATION OF AMERICA, Defendant and Respondent.

1250

**COUNSEL**

Blecher & Collins, Maxwell M. Blecher, John E. Andrews and James Robert Noblin for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Herschel T. Elkins and Thomas Greene, Assistant Attorneys General, Ronald A. Reiter, Deputy Attorney

General, Gil Garcetti, District Attorney (Los Angeles), Thomas A. Papageorge, Deputy Distirct Attorney, and Daniel Berko as Amici Curiae on behalf of Plaintiff and Appellant.

David B. Bloom, James E. Adler, Golenbock, Eiseman, Assor & Bell and Martin S. Hyman for Defendant and Respondent.

## OPINION

**WERDEGAR, J.**—Business and Professions Code section 17045,[1] part of California's Unfair Practices Act (hereafter the UPA; see § 17000), prohibits a seller from secretly allowing a purchaser special "unearned discounts" that injure "a competitor" and tend to destroy "competition." The question before us is whether the competition referred to is limited to competition among sellers of the particular good or service, or includes economic competition among buyers as well. More concretely, does a disfavored buyer adequately plead a cause of action against a seller for violation of section 17045 by alleging the seller's secret discrimination injured the buyer and tended to destroy competition among buyers, or must the disfavored buyer allege injury to one or more of the seller's competitors and a tendency to destroy competition among sellers? Upon an examination of the statutory language, context, purposes and history, we conclude a cause of action may be pled by alleging competitive injury among buyers.

This case also calls upon us to interpret another section of the Business and Professions Code, section 17203, one of several statutes that together are sometimes referred to as the "unfair competition law." (§§ 17200-17209; see, e.g., *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660].) The question presented is whether a plaintiff may, under section 17203, seek restitution of money lost by the plaintiff or gained by the defendant as a result of the defendant's acts of unfair competition, without also seeking an injunction against future acts of unfair competition. We will hold injunctive relief is not a prerequisite to restitution under section 17203.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff ABC International Traders, Inc. (ABC) is a wholesale distributor of telephone equipment and other electronic products. ABC's second

---

[1] Unless otherwise specified, all statutory references are to the Business and Professions Code.

amended complaint names as defendants Matsushita Electric Corporation of America (MECA), Procom Supply Corporation (Procom), and Tele-Com Office Products Corporation (Tele-Com). MECA produces electronic products under the brand name Panasonic. Procom and Tele-Com are wholesale distributors of electronics, in competition with ABC.

The case comes to us following ABC's appeal of the trial court's dismissal of the action against MECA after the court sustained MECA's demurrer without leave to amend. ■ For purposes of such an appeal, we take the properly pleaded material allegations of ABC's complaint as true; our only task on review is to determine whether the complaint states a cause of action. (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 732 [268 Cal.Rptr. 779, 789 P.2d 960].)

The complaint sets forth two causes of action as to all defendants. The first is for violation of the UPA, "and in particular Sections 17045-17048." ABC alleges that in 1989 it suspected, but had no direct information to confirm, MECA was providing Procom and Tele-Com a 5 percent discount on Panasonic products, a discount not provided to ABC. In October 1991, MECA stopped selling to ABC altogether. In September 1992, ABC learned from employees of Procom that MECA had "for years" been giving Procom and Tele-Com a 5 percent discount from the price charged to other wholesalers.

ABC alleges the 5 percent discount was unearned, in that the recipients' wholesale marketing services were identical to those performed by ABC and others, and was secret, in that neither MECA nor any recipient of the discount confirmed its existence to ABC or to the market generally. ABC alleges damages in the amount of the lost discount plus lost profits from reduced sales of Panasonic products. It also charges that the discriminatory discount "tended to destroy competition" among electronics wholesalers, in that the favored wholesalers were in turn able to offer retailers lower prices than those offered by the disfavored wholesalers.

In its second cause of action, ABC alleged the above acts also constituted violations of the unfair competition law. Pursuant to section 17203, ABC sought restitution of all moneys ABC lost and disgorgement of all profits defendants received as a result of their acts of unfair competition.

The trial court granted MECA's demurrer on both causes of action without leave to amend. The Court of Appeal affirmed. As to the first cause of action, the court held the elements of a section 17045 violation were not met, because ABC did not allege any injury to *MECA's* competitors or any

tendency to destroy competition among electronics *producers*. The court believed our decision in *Harris* v. *Capitol Records etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139], which reached a similar result in an action brought under other provisions of the UPA, compelled that conclusion. On the second cause of action, the Court of Appeal held the complaint deficient "because it sought restitution and disgorgement without injunctive relief." For reasons explained below, we conclude the Court of Appeal erred in both these respects.

## I. COMPETITIVE INJURY UNDER SECTION 17045

### A. *Statutory Language and Context*

Section 17045 provides: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

■ MECA contends the class of "competitors" and the "competition" protected under section 17045 is restricted to competitors of the person allowing an unearned discount—sometimes called the "primary" line of commerce—as opposed to competitors of the person receiving it—the "secondary" line. As is immediately apparent, however, the statutory language contains no such express restriction. Indeed, to the extent any inference can be drawn from the law's wording, it is to the contrary. On its face, section 17045 is "aimed at preventing a distributor from discriminating between customers." (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 [70 Cal.Rptr. 849, 444 P.2d 481].) The statute being focused patently on discrimination among purchasers, one might reasonably assume the legislative purposes included protecting purchasers, such as wholesalers and retailers, against the competitive injury resulting from discrimination by those higher up the marketing chain. Judicial and academic writers concerning themselves specifically with section 17045 have, in fact, so assumed. (See *Diesel Electric Sales & Service, Inc.* v. *Marco Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202, 213-214 [20 Cal.Rptr.2d 62]; McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F. L.Rev. 165, 181-182.)

■ MECA contends the intent to protect only against competitive injury in the primary line can be discerned from the Legislature's *omission* of certain language contained in federal price discrimination statutes. Section 2

of the federal Clayton Act of 1914 forbids certain types of price discrimination in interstate commerce "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." (15 U.S.C. § 13(a); see *Van Camp & Sons* v. *Am. Can Co.* (1929) 278 U.S. 245, 252-253 [49 S.Ct. 112, 113, 73 L.Ed. 311, 60 A.L.R. 1060] [section 2 of Clayton Act includes lessened competition in secondary line].) In the Robinson-Patman Act of 1936, Congress amended this section of the Clayton Act, inter alia, by additionally prohibiting discrimination the effect of which is "to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." (15 U.S.C. § 13(a); see *F.T.C.* v. *Anheuser-Busch, Inc.* (1960) 363 U.S. 536, 542-545 [80 S.Ct. 1267, 2170-1272, 4 L.Ed.2d 1385] [added language, like original Clayton Act language, includes injury in either primary or secondary line].) The Robinson-Patman Act also made it unlawful "knowingly to induce or receive a discrimination in price which is prohibited by this section." (15 U.S.C. § 13(f).) MECA argues that section 17045, by contrast, focuses on the acts of sellers, rather than buyers, and contains no specific reference to competition in the secondary line.

MECA's argument ignores the statutory context of section 17045. While section 17045 itself does not focus directly on the purchaser's acts in obtaining a discriminatory price or other preference, the immediately following sections of the UPA do. Section 17046 makes it unlawful to "use any threat, intimidation, or boycott, to effectuate any violation" of the UPA. Section 17047 makes it illegal to "solicit" the same. Similarly, section 17048 makes it unlawful to "participate or collude" in violating the UPA. It thus appears the Legislature, like Congress in enacting section 2(f) of the Robinson-Patman Act (15 U.S.C. § 13(f)), was concerned with the wrongful receipt, as well as the payment, of discriminatory prices, and, inferentially, with the injurious effect such wrongful receipt would have on the recipient's competitors.

Section 17045, to be sure, does not contain an explicit reference to secondary line competitive injury like the quoted language of the Clayton and Robinson-Patman Acts. Our interpretive task would be easier if it did. But the absence of a specific reference does not, in this context, constitute an implied restriction. The statute requires injury to a "competitor," and a tendency to destroy "competition," without any further inclusive *or* restrictive language delineating the scope of those terms. As we have seen, section 17045's evident concern with discrimination between competing purchasers suggests its intended protection extends to such competition. That the language used is somewhat less explicit than that of federal price discrimination

laws does not persuade us we should read into the statute a restriction contrary to its apparent intent.[2]

## B. *Statutory Purposes and Historical Background*

Our conclusion is strengthened when we consider the purposes and history of the UPA in general and section 17045 in particular.

The declared purposes of the UPA are "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (§ 17001.) In upholding the law against an early constitutional challenge, this court described it as a legislative attempt "to regulate business as a whole by prohibiting practices which the legislature has determined constitute unfair trade practices." (*Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486]; see also *Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 478 [55 P.2d 177] (dis. opn. of Shenk, J.) [UPA "appears to be a painstaking endeavor by the legislature to combat the abuses which the business interests have deemed unfair practices in the competitive field."].) The Legislature thus, as a Court of Appeal has remarked, "set itself no small goal." (*Paramount Gen. Hosp. Co.* v. *National Medical Enterprises, Inc.* (1974) 42 Cal.App.3d 496, 500 [117 Cal.Rptr. 42].) That it might have a better chance of success, the Legislature specifically directed that the UPA's provisions "shall be liberally construed that its beneficial purposes may be subserved." (§ 17002.)

Section 17045 seeks to foster "fair and honest competition" (§ 17001) by prohibiting certain "dishonest, deceptive . . . and discriminatory practices" (*ibid.*), including the secret allowance of an unearned discount where such allowance injures a competitor and tends to destroy competition. We think it clear section 17045 would more fully serve the UPA's purposes if its protections were to extend to the secondary line. Business competition among buyers of a product is competition, no less than that among sellers. A

---

[2]Needless to say, we repudiate the dissent's suggestion we have "perverse[ly]" attempted to "introduce[] into the statute an ambiguity that is not present if the words are taken to mean what they say." (Dis. opn., *post*, at p. 1272.) In our view, the text of section 17045 is not so much ambiguous as simply silent on the question before us; it neither restricts "competition" to the primary line, nor expressly extends to competition in the secondary line. The dissent, like MECA, relies heavily on a supposed implication arising from section 17045's reference to the prohibited acts of sellers, but, as we have seen, any such implication dissolves when the statutory context—especially sections 17046, 17047 and 17048—is considered. In any event, the dissent's inferential method of interpretation hardly justifies its claim of unique fidelity to the plain statutory text.

deceptive practice that tends to destroy competition is no less repugnant to the policy of the UPA because the competitive injury occurs among wholesalers or retailers, rather than among producers. As the United States Supreme Court explained in holding the Clayton Act's anti-price-discrimination provision applicable to secondary line injury, "[t]he fundamental policy of the legislation is that, in respect of persons engaged in the same line of . . . commerce, competition is desirable and that whatever substantially lessens it or tends to create a monopoly in such line of commerce is an evil. Offense against this policy, by a discrimination in prices exacted by the seller from different purchasers of similar goods, is no less clear when it produces the evil in respect of the line of commerce in which they are engaged than when it produces the evil in respect of the line of commerce in which the seller is engaged." (*Van Camp & Sons* v. *Am. Can Co., supra,* 278 U.S. at p. 254 [49 S.Ct. at p. 114].) In light of the legislative mandate that we construe section 17045 "liberally . . . that its beneficial purposes may be subserved" (§ 17002), we must, in the absence of clear evidence of a contrary legislative intent, interpret the statute to protect against competitive injury in the secondary, as well as primary, lines of commerce.

In further aid of the UPA's effective enforcement, moreover, its enactors provided that an action to enjoin a violation or recover damages may be brought by "[a]ny person or trade association." (§ 17070.) Thus the law "denounces unfair competition and so-called piratical trade transactions, and *was designed to afford full relief against such abuses on behalf of anyone aggrieved.*" (*Max Factor & Co.* v. *Kunsman, supra,* 5 Cal.2d at p. 478 (dis. opn. of Shenk, J.), italics added; see also Grether, *Experience in California with Fair Trade Legislation Restricting Price Cutting* (1936) 24 Cal.L.Rev. 640, 647 (hereafter Grether) [broad standing provision later codified as section 17070 was designed to allow trade groups to "police" competition in their various trades].) Hence, a retailer or wholesaler, or a trade organization representing such a class of merchants, clearly has standing to sue a producer for offering secret rebates or discounts to some members of the group but not to others. Yet, under MECA's interpretation of section 17045, such plaintiffs may not rely on their own injury, or on the destruction of competition among themselves, but must instead, or in addition, plead and prove injury at the producer's level.[3] Such a construction would work to frustrate, rather than further, the UPA's goal of furthering competition at all levels of trade.

---

[3]MECA concedes ABC had standing to bring this action, but maintains ABC is nonetheless required to plead and prove injury to one of *MECA's* competitors.

 Turning to the UPA's historical background, we find additional confirmation for our conclusion.[4] As will be seen below, the historical evidence strongly suggests the statute later codified as section 17045 was aimed primarily at protecting against competitive injury among buyers of goods, rather than sellers. More specifically, the statute's prohibitions on secret discriminatory prices and rebates appear to have been intended mainly to restrain the quickly growing chain stores from certain well-documented abuses of their buying power, abuses that, together with other factors, were thought to have a highly destructive effect on wholesale and retail competition in the food industry and other trades.

The UPA came into being piecemeal. Although a prohibition on locality discrimination (now § 17040) was first enacted in 1913, two other major substantive provisions, the prohibitions on secret rebates and unearned discounts (§ 17045) and on sales below cost (§ 17043), were not added until 1933. (Stats. 1913, ch. 276, § 1, p. 508; Stats. 1933, ch. 261, § 1, p. 793; Stats. 1933, ch. 504, § 1, p. 1280.) In 1935, the entire law was repealed and reenacted as a whole, supplemented and given its present name. (Stats. 1935, ch. 477, § 1, pp. 1546-1551.) In 1941 it was codified in the Business and Professions Code with the basic structure it has today. (Stats. 1941, ch. 526, § 1, pp. 1839-1846.) The pertinent historical background, then, is that of the early to middle 1930's.

The chain store problem "became important in the 1920's [and] resulted in political action that culminated in the 1930's." (Edwards, The Price Discrimination Law (1959) p. 10 (hereafter Edwards).) Between 1919 and 1927, retail sales by grocery chains almost quadrupled; those by drug, candy and variety chains more than doubled. (*Id.* at p. 9.) While lawmakers had earlier been concerned primarily with geographic discrimination used to obtain a local monopoly, new problems came to the fore during the 1920's as the chains grew in size, integrated wholesale and retail functions, and gained extraordinary purchasing power. (*Id.* at pp. 8-9.) The perceived importance of the chain store problem grew with the coming of the Depression, which "added to the economic distress of independents and intensified their fear and hatred of the chains, whose price appeal was sharpened by the slash in consumer income." (Palamountain, The Politics of Distribution (1955) p. 160 (hereafter Palamountain).)

In 1926, the Federal Trade Commission (FTC) began an investigation of the chain stores; the investigation produced numerous interim reports and a

---

[4]The parties have not provided, and our own research has not discovered, any direct legislative history relating to the enactment of section 17045's predecessor. Of necessity we rely on broader evidence of the legal and economic concerns motivating the law.

final report issued in December 1934. (Edwards, *supra*, at p. 10.) The FTC found a pattern of "special discounts and allowances" granted to chains in preference to independent wholesalers and retailers. (FTC, Final Rep. on Chain-Store Investigation, Sen. Doc. No. 4, 74th Cong., 1st Sess., p. 60 (1935).) Grocery manufacturers reported selling to chain stores at a discount from the price charged other customers. In many cases the discount was purportedly for volume buying, but "the quantity purchased ha[d] no relation to the difference in price," the discount actually being only the result of hard bargaining by the chain purchaser. (*Id.* at p. 61.) Some manufacturers, in grocery and other industries, regularly granted chains a discount of up to 10 percent, with other distributors allowed only a much lower discount. For example, one manufacturer gave buyers a "confidential rebate" at year's end, "the rate to wholesalers being 2 percent, to chains generally it was 5 percent, but to two particular chains, it amounted to 10 percent." (*Id.* at p. 62.) In addition, a large number of manufacturers in the grocery, drug, tobacco and candy industries reported that the chain purchasers, through bargaining, had obtained preferential "promotional allowances," which in some cases were "not used for that purpose [advertising] at all" and bore "no direct relation to the volume of sales." (*Id.* at p. 61.) Similarly, the chains demanded and were granted special allowances for brokerage. (*Id.* at p. 62.)

As in the case just noted, of a manufacturer whose year-end rebates to buyers were kept "confidential," preferential rebates and unearned discounts were typically not disclosed publicly or to the trade generally. To the contrary, these discounts—or their unearned character—were frequently kept secret so that the buyer's competitors would not demand the same treatment. (See Fulda, *Food Distribution in the United States: The Struggle Between Independents and Chains* (1951) 99 U.Pa. L.Rev. 1051, 1086 (hereafter Fulda) [unearned advertising allowance constitutes "an indirect secret rebate"]; *id.* at pp. 1130-1131 [New York Great Atlantic & Pacific Tea Company's (A & P's) use of illusory quantity discounts as disguised preference]; *id.* at pp. 1132-1133 [examples of A & P's efforts to keep its unique price concessions secret].)

Depression conditions, moreover, gave chains greater relative buying power; "[c]onsequently, the difference between the prices charged chains and those charged smaller distributors apparently widened, and the attention of independents was increasingly focused on discounts." (Palamountain, *supra*, p. 192.) The resulting "secret rebates" and other discriminatory allowances were not insignificant in size; in the best known case, that of the A & P chain, they totaled more than $8 million in the single year 1934. (*New York Great Atl. & Pac. Tea Co.* v. *Grosjean* (1937) 301 U.S. 412, 421 [57 S.Ct. 772, 775, 81 L.Ed. 1193, 112 A.L.R. 293].) "The leverage which

accomplished this was the enormous purchasing power of the company." (*Ibid.*)

The perceived impact of such deceptive and discriminatory practices on the chains' competitors—the independent retailers and wholesalers—was the primary evil targeted in the Robinson-Patman Act. "It is . . . too well known to require extensive exposition . . . that the 1936 Robinson-Patman amendments to the Clayton Act were motivated principally by congressional concern over the impact upon secondary-line competition of the burgeoning of mammoth purchasers, notably chain stores." (*F.T.C.* v. *Anheuser-Busch, Inc.*, *supra*, 363 U.S. at pp. 543-544 [80 S.Ct. at p. 1271], fn. omitted.) The problem was perceived to have both economic and, more broadly, social aspects. Economically, price discrimination in favor of chains added to their cost advantage over competing retailers, helping them to undersell the independents and ultimately drive them from the field, thereby tending to create monopoly conditions. (FTC, Final Rep. on the Chain-Store Investigation, *supra*, Sen. Doc. No. 4, 74th Cong., 1st Sess., at p. 64; see also Rowe, *The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective* (1957) 57 Colum. L.Rev. 1059, 1062 [while chain stores grew in the 1920's and 1930's, independent retailers went out of business at an average rate of 10 percent per year].) Socially, it was feared the result of chain store domination would be the loss of an endangered middle class, the "prosperous *bourgeois* class [that] has been considered one of the mainstays of our civilization." (Comment (1933) 22 Cal.L.Rev. 86, 101.)[5]

The pressure for remedial legislation was not confined to Washington. In California, a fair trade law, authorizing retail price maintenance agreements

---

[5]Representative Wright Patman, introducing his 1935 bill in the House of Representatives, described both aspects of the chain store problem in characteristically vivid language: "In the field of merchandise distribution a Goliath stands against divided forces plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents. [¶] The Goliath is the huge chain stores sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness. [¶] His weapon is huge buying power, by the manipulation of which he threatens manufacturers and others with financial stringency or even bankruptcy if they refuse him the prices and terms he demands. His opponents are not only these manufacturers, not only the independent competitors whom he seeks to eliminate, but the consuming public, whom he hopes then to have at his mercy." (Remarks of Rep. Wright Patman introducing H.R. No. 8442, 74th Cong., 1st Sess., 79 Cong. Rec. 9077 (June 11, 1935) reprinted in 4 Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes (1980) p. 2927 (hereafter Kintner).) Elsewhere Representative Patman emphasized that the chains were enriching themselves at the expense of independent merchants not through fair and open competition but through "secret rebates" and "special discounts" not available to the independents. (House Debate on H.R. No. 8442, 74th Cong., 2d Sess., 80 Cong. Rec. 8102 (May 27, 1936) reprinted in 4 Kintner, *supra*, at p. 3268.)

with respect to trademarked products, had been passed in 1931 and strengthened in 1933. (Stats. 1931, ch. 278, p. 583; Stats. 1933, ch. 260, § 1, p. 793, repealed Stats. 1975, ch. 402, § 1, p. 878.) In part because much of the grocery trade dealt in unbranded goods, however, the law was of limited usefulness in that industry. (Fulda, *supra*, 99 U.Pa. L.Rev. at p. 1117.) The independent grocers therefore led the political fight for the UPA, which was opposed by the grocery chains. (Grether, *supra*, 24 Cal.L.Rev. at pp. 647-648; see also Fulda, *supra*, 99 U.Pa. L.Rev. at pp. 1117-1118, fn. 288 [quoting an officer of the California Retail Grocers and Merchants Association as saying the UPA "is the finest law ever enacted on the Statute books of any state, as far as our industry is concerned"].)

This history teaches that a primary concern in the enactment of the UPA was the protection of smaller, independent retailers, especially grocers, against unfair competitive practices of the large chain stores. As a contemporary commentator explained, the prohibitions added in 1933 on secret rebates and unearned discounts (now section 17045) and below-cost sales (now section 17043) "are designed to protect the retailer whose more powerful neighbor is attempting to drive him out of business." (Comment, *supra*, 22 Cal.L.Rev. at p. 102; see also *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 271 [195 Cal.Rptr. 211, 41 A.L.R.4th 653] [UPA closely parallels, and is based upon same policies as, Robinson-Patman Act]; *Uneedus* v. *California Shoppers, Inc.* (1978) 86 Cal.App.3d 932, 937 [150 Cal.Rptr. 596] [same].) More specifically, the provision that became section 17045 was almost certainly designed to prohibit and protect against the practice of granting to chains and other large distributors, as a result of their much greater bargaining power, secret rebates, unearned discounts and other unearned allowances not granted to smaller, independent merchants. These practices had been thoroughly investigated and were widely known, and were believed to have highly destructive effects on competition at the wholesale and retail levels in a variety of industries. The competitive injury involved was to the disfavored buyers, and the tendency to destroy competition was in the line of commerce practiced by the favored buyer.[6]

Thus, the background of the UPA's prohibition on unearned discounts, codified as section 17045, confirms our view the statute was intended

---

[6]By 1938, there were a large number of state unfair practices acts, commonly prohibiting unjustified price discrimination as well as sales below cost. A commentator at that time identified an important purpose of the anti-discrimination provisions as "the prevention of discriminatory sales by manufacturers to customers with unusually strong bargaining power who can force large price concessions." (Comment, *Prohibiting Price Discrimination and Sales Below Cost: The State Unfair Practices Acts* (1938) 32 Ill. L.Rev. 816, 819-820, fn. omitted; see also Dewell & Gittenger, *The Washington Antitrust Laws* (1961) 36 Wash. L.Rev. 239, 277 [Washington's "secret rebate" statute, worded similarly to section 17045, was designed to prohibit similar types of business conduct as the federal Robinson-Patman Act]; *Ideal Plumbing Co.* v. *Benco* (8th Cir. 1976) 529 F.2d 972, 978, fn. 7 [42 A.L.R.Fed. 266]

primarily to protect against competitive injury in the secondary line of commerce, i.e. at the level of the discount's recipient. In the present case, ABC alleged just such injury and tendency to destroy competition.

MECA accuses ABC of construing section 17045 "as though it were designed to protect individual dealers from price competition at the expense of consumers." Such an interpretation would assertedly be inconsistent with the statutory purpose, as MECA characterizes it, of "insuring the continued existence of vigorously competitive markets." While some commentators, MECA notes, have criticized aspects of the Robinson-Patman Act or its enforcement as anticompetitive and therefore in conflict with other antitrust laws, the California Legislature, MECA argues, avoided such conflicts in policy by "limiting the [UPA's] scope entirely to pro-competitive regulation of primary-line competition."

For three reasons, we find MECA's policy arguments unpersuasive. First, the interpretive question in this case does not concern protection of individual competitors versus competition generally. By its terms, section 17045 requires the plaintiff to prove not only injury to a competitor, but, *in addition*, a tendency "to destroy competition." (Cf. Fulda, *supra*, 99 U.Pa. L.Rev. at p. 1109 [*disjunctive* language of Robinson-Patman Act section 2(a), 15 United States Code section 13(a), has been interpreted as including discrimination that causes injury only to a particular competitor].) Thus, whatever may be the federal law or enforcement pattern, section 17045 applies only when the discriminatory rebate, discount or allowance has a tendency to destroy competition *generally*. The only question here is whether "competition" includes business competition at the level of the favored purchaser, as well as at the level of the seller. For reasons already discussed, we conclude that, for purposes of section 17045, competition is competition, whether among retailers, wholesalers or producers.

Second, MECA's view of the statutory purposes is unjustifiably narrow. Section 17045, and the UPA as a whole, reflect a Legislative concern not only with the maintenance of competition, but with the maintenance of *"fair and honest* competition." (§ 17001, italics added; see also *State* v. *Langley*, *supra*, 84 P.2d at p. 772 [The aim of the Wyoming unfair practices act "is to maintain fair competition, but to prevent unfair and ruinous competition."].)

[same as to Arkansas statute, enacted in 1937, whose prohibitory language is identical to that of section 17045]; *Jauquet Lumber* v. *Kolbe & Kolbe Millwork* (1991) 164 Wis.2d 689 [476 N.W.2d 305, 309] [Wisconsin statute worded almost identically to section 17045 "was designed to accomplish the same goals" as Robinson-Patman Act]; *State* v. *Langley* (1938) 53 Wyo. 332 [84 P.2d 767, 774] [Wyoming unfair practices act "probably intended mainly for their [independent merchants'] benefit."].)

Our law attempts to foster such competition through the prohibition of certain "unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices" (§ 17001), including the solicitation and allowance of secret discriminatory discounts and rebates (§§ 17045, 17047). As long ago as 1903, a leading commercial court observed that "[w]hile public policy demands a healthy competition, it abhors favoritism, secret rebates, and unfair dealing . . . ." (*John D. Park & Sons Co.* v. *National W. Druggists' Ass'n* (1903) 175 N.Y. 1 [67 N.E. 136, 139].) Section 17045 reflects the same policy viewpoint.

Finally, to the extent MECA's arguments go to the *wisdom* of protecting secondary line competition, rather than to the legislative intent, they are irrelevant to our interpretive task. ■ As this court said 59 years ago, in rejecting a constitutional challenge to the UPA, "[i]t is not for the courts, except within the limits herein set forth, to determine whether or not the policy of a statute is economically sound or beneficial. That is a matter solely for the legislature." (*Wholesale T. Dealers* v. *National etc. Co., supra,* 11 Cal.2d at pp. 646-647.) ■ MECA has not shown, to the degree of certainty required to exclude the possibility of a contrary legislative view, that the protection of fair and honest competition in the secondary line necessarily impedes retail competition and inures to the detriment of the ultimate consumer. It has been argued, with at least equal persuasiveness, that the chain stores' solicitation and receipt of secret favoritism from producers hurt consumers in two ways: In the short term, it was believed, the producers recouped the losses in sales to chains by charging higher prices to the independent wholesalers and retailers, who passed them on to consumers; in the long term, the secret rebates helped chains move toward monopoly or dominance in some markets, allowing them ultimately to raise consumer prices. (FTC, Final Rep. on the Chain-Store Investigation, *supra,* Sen. Doc. No. 4, 74th Cong., 1st Sess., at p. 64; Fulda, *supra,* 99 U.Pa. L.Rev. at pp. 1105-1106.) Some have thought these concerns exaggerated (see, e.g., Edwards, *supra,* p. 10, fn. 19 [reporting dispute over FTC's conclusion that price discrimination in favor of chains contributed substantially to chains' ability to undersell independent retailers]), but where the truth lies in such economic debates is not for us to say.

C. *Prior Judicial Interpretation: Harris v. Capitol Records etc. Corp.*

MECA, like the Court of Appeal, relies principally on certain language in our decision in *Harris* v. *Capitol Records etc. Corp., supra,* 64 Cal.2d 454 (hereafter *Harris*). Read in context of the issues actually presented in that case, however, *Harris* neither binds us precedentially to MECA's position nor persuades us to adopt it.

In *Harris*, a phonograph record retailer sued three record distributors, alleging they had given a competing retailer, a former "rack-jobber" who had opened his own retail store across the street from plaintiff's, larger dealer discounts than those allowed the plaintiff. The plaintiff contended the differential discounts constituted "locality discrimination" as defined in section 17031 and prohibited in section 17040. (*Harris, supra,* 64 Cal.2d at pp. 456-457.)[7] This court affirmed summary judgment for the defendants.

■ We held, first, that the UPA's locality discrimination prohibition, while somewhat broadened by a 1931 amendment, retained a necessary element of *geographic* price difference; what was fundamentally prohibited was discrimination between locations, rather than between purchasers as such. (*Harris, supra,* 64 Cal.2d at pp. 458-460.) In particular, the defining language of section 17031 ("selling . . . at a lower price . . . in one location . . . than in another") implied that a seller, to violate section 17040, "must have at least two different places of business and must sell at a lower price *in* one than *in* the other." (64 Cal.2d at p. 460.) Locality discrimination could therefore not be proven in *Harris,* as the two locations involved were owned by the competing buyers, not by any of the sellers. (*Ibid.*) Apparently as an alternative ground of decision, we went on to agree with the defendants' argument that "section 17040 is intended to apply only to competition on the same 'level' as the person allegedly creating the locality discrimination." (*Ibid.*)

■ The above summarized discussion in *Harris* was addressed solely to the claim the defendants had committed locality discrimination, as defined in section 17031 and prohibited in section 17040. Although the plaintiff apparently did not claim the defendants had also violated section 17045, we briefly addressed that possibility later in the decision. We held section 17045 did not apply to advertising allowances allegedly granted to the competing retailer, because the allowances were neither secret nor discriminatory, being available to all purchasers buying on like terms and conditions. (*Harris, supra,* 64 Cal.2d at p. 463.)

---

[7]Section 17040 provides: "It is unlawful for any person engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition of any person who in good faith, intends and attempts to become such dealer, to create locality discriminations. [¶] Nothing in this section prohibits the meeting in good faith of a competitive price."

Section 17031 provides: "Locality discrimination means a discrimination between different sections, communities or cities or portions thereof, or between different locations in such sections, communities, cities or portions thereof in this State, by selling or furnishing an article or product, at a lower price in one section, community or city, or any portion thereof, or in one location in such section, community, or city or any portion thereof, than in another."

MECA does not rely on this portion of *Harris*, in which we directly addressed section 17045, but on an earlier parenthetical mention of the statute in our discussion of locality discrimination. The cited passage is as follows: "Throughout the Act the Legislature has manifested its intent to discourage practices which injure the seller's competitors (§§ 17040, 17043, 17045, 17071) and thereby tend to create the monopolies condemned by section 17001 [citation]. Equally apparent is the Legislature's concern to allow the seller to meet in good faith the prices of his competitors (§§ 17040, 17050), thereby fostering the competition promoted by section 17001. Together these constitute the 'horizontal' concept of price regulation, one of the fundamental characteristics of this legislation." (*Harris, supra,* 64 Cal.2d at p. 461.)

The issue under discussion in this part of *Harris* was whether the differential discount offered by a record company to one of two retailers—record stores located across the street from one another—constituted locality discrimination within the meaning of sections 17031 and 17040. Not surprisingly, we held it did not. Neither our discussion of locality discrimination as a whole, nor the above quoted inclusion of section 17045 in a parenthetical dictum, can reasonably be read as *holding* that a disfavored buyer alleging a violation of section 17045 must plead and prove competitive injury in the primary line of commerce. This is especially so in light of the later passage, already discussed, in which we specifically focused on section 17045 and held it inapplicable for reasons unrelated to the fact the injuries alleged by the *Harris* plaintiff were to the buyer's competitors, rather than the seller's. (64 Cal.2d at p. 463.) Thus, the *Harris* decision has no *binding* precedential effect on the current case.[8]

Nor does the *Harris* court's analysis of section 17040 *persuade* us to MECA's interpretation of section 17045. In our view, both sections of the UPA are designed to foster competition and prevent monopoly conditions, but the particular threats to competition they are principally intended to meet are fundamentally different. As we observed in *Harris*, the threat to competition caused by locality discrimination was typically to primary line competition. A "large retail chain," we explained, could "lower its prices at a

[8]In support of its interpretation, MECA also cites *Plotkin* v. *Tanner's Vacuums* (1975) 53 Cal.App.3d 454 [125 Cal.Rptr. 697], and *Carlock* v. *Pillsbury Co.* (D.Minn. 1989) 719 F.Supp. 791. *Plotkin* did not involve unearned discounts or any form of discriminatory pricing, and discussed only sections 17040 and 17043. The discussion in *Carlock* concerned only section 17040. Similarly, the dissenting opinion's reliance on *Beam* v. *Monsanto Co., Inc.* (1976) 259 Ark. 253 [532 S.W.2d 175, 181-182] (dis. opn., *post,* at p. 1279, fn. 2) is misplaced, as that decision concerned only a locality discrimination prohibition modeled on sections 17031 and 17040.

store in one area, constituting a severable market, until the competition from smaller, local businesses in that community had been eliminated, concurrently offsetting the losses it thus suffered by charging higher prices in its other areas of operation. After the demise of competitors, the chain outlet would then realize monopoly profits, and the process of attrition would be repeated elsewhere." (*Harris, supra,* 64 Cal.2d at p. 458.) Locality discrimination was an anticompetitive abuse engaged in by chain retailers *as sellers,* to the injury of competing *sellers.* As we have seen earlier, however (see *ante,* pt. I.B.), the solicitation and extortion of secret rebates, unearned discounts and other discriminatory allowances was an anticompetitive abuse historically engaged in by the chains as *buyers,* to the injury of competing *buyers,* i.e. the independent retailers and wholesalers. That the Legislature may have intended section 17040 to protect mainly against injury in the primary line, therefore, does not detract from our earlier conclusion that the protections of section 17045 extend to injury in the secondary line.[9]

The difference in principal application between section 17045 and the locality discrimination prohibition in sections 17040 and 17031 is reflected in their language. Neither section 17040 nor section 17031 refers to individual purchasers. Locality discrimination, as defined in section 17031, requires different prices at different "locations." Thus "the smallest geographic unit [section 17031] envisages is the individual store or outlet, not the individual purchaser regardless of location." (*Harris, supra,* 64 Cal.2d at p. 460.) Sections 17031 and 17040 are tailored to address the problem of a distributor, typically a retailer, selling out of many locations, who might use geographical price discrimination as a predatory practice against its own competitors.

Section 17045, in contrast, forbids discrimination in favor of "certain purchasers" at the expense of other "purchasers." As discussed earlier (pt.

---

[9]For the proposition that the UPA operates "horizontally" rather than "vertically," we cited, in *Harris,* three law review articles, two of which MECA cites for the same proposition. None specifically addresses the question before us. The principal authority relied upon, Professor Ewald Grether, appears to have meant, in distinguishing between the "horizontal" UPA and the "vertical" Fair Trade Law, merely that under the UPA "action . . . need not wait upon the initiative of manufacturers or distributors at the apex of the distributive pyramid, but may arise at any level." (Grether, *supra,* 24 Cal.L.Rev. at p. 686.) One should also note that Professor Grether, in the cited article, focused on the historical background and prospects for enforcement of the UPA and Fair Trade Law, and disavowed any intent to engage in "[i]nterpretation of the law, technically speaking." (*Id.* at p. 641.) The reference to "the horizontal concept of trade regulation" in Cupp, *The Unfair Practices Act* (1936) 10 So.Cal.L.Rev. 18, is brief and nonspecific. The final academic passage quoted in *Harris, supra,* 64 Cal.2d at pages 461-462, deals specifically with primary versus secondary line injury, but was concerned only with the locality discrimination provisions, which, of course, were also the only provisions at issue in this part of *Harris.* (Bermingham, *Legal Aspects of Petroleum Marketing Under Federal and California Laws* (1960) 7 UCLA L.Rev. 161, 246-247.) None of the cited passages persuades us to MECA's view of section 17045.

I.A., *ante*), the section is patently concerned with "preventing a distributor from discriminating between customers." (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.*, *supra*, 69 Cal.2d at p. 323.) Moreover, section 17045, unlike the locality discrimination provisions, applies only to "secret" rebates and discounts. A retail seller, needing to attract buyers in large number, typically advertises any available discounts and rebates widely, rather than keeping them secret. In contrast, a producer from whom a large retailer has extracted special concessions might well prefer to keep such concessions secret. Section 17045 is thus tailored to address the problem of a manufacturer or other producer who is forced or induced to give preferential prices to one or more individual purchasers, typically retailers. This practice, of course, is likely to be injurious to the disfavored *buyers'* business position and may tend to destroy competition among such *buyers*.

The dissent imagines that our reading of section 17045 originates in a "desire to do good, be universally fair, and make everybody happy." (Dis. opn., *post*, at p. 1272.) While we need not go so far as to disclaim all interest in fairness and human happiness, our goal in this case has been narrower and simpler: we have attempted to discover the legislative intent by examining the statutory language, the stated purposes of the law and the historical background of its enactment. If we have mistaken that intent, or if the Legislature determines today's economic conditions require a different regulatory scheme, the remedy lies with that body "on the other side of Tenth Street." (*Osborn* v. *Hertz Corp.* (1988) 205 Cal.App.3d 703, 711 [252 Cal.Rptr. 613].)

Reading beyond the dissenting opinion's hyperbolic rhetoric, its main argument seems to be that "interbrand competition" is the sole proper end of antitrust legislation, that "vertical restrictions" on trade are *per se* unobjectionable, and that fair and open competition among wholesalers and retailers could not, therefore, possibly be considered worthy of legislative protection. In response, it is perhaps sufficient to observe that *none* of these precepts are reflected in the language, stated purposes, or history of the UPA. Section 17045 requires proof of injury to, and a tendency to destroy, "competition," not "interbrand competition." Whether economists, professors of law or our dissenting colleague believe today that the use of secret, discriminatory rebates and discounts is an efficient "vertical restriction," is immaterial, because it is clear that in 1933 the California Legislature considered such hidden discrimination to be a "dishonest, deceptive, . . . and discriminatory practice" destructive of "fair and honest competition." (§ 17001.) Finally, whatever the current economic orthodoxy may be, the historical background we have rehearsed above belies the dissent's assumptions. During the period

of section 17045's enactment, the chain stores' receipt of secret rebates, unearned discounts and allowances was widely understood as a threat to vigorous and fair competition at the retail and wholesale levels, and the potential loss of independent merchants engaged in such competition was regarded as an economic and social problem requiring legislative redress.

In summary, the language, context, purposes and history of section 17045 all point to the conclusion its protection extends to competition in the secondary line. The Court of Appeal therefore erred in affirming the order sustaining MECA's demurrer to ABC's first cause of action and the subsequent dismissal.[10]

## II. Restitution Under Section 17203

■ Section 17203 provides, in pertinent part: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."[11] MECA contends restitution is available as relief under section 17203 only when ancillary to an injunction. The Court of Appeal agreed, holding ABC's cause of action under section 17203 was properly dismissed on demurrer because no prayer was made for an injunction against future unfair competition.

Nothing in the actual language of section 17203 indicates the availability of restitution is contingent on the issuance of an injunction. The statute contains, as ABC notes, no language of condition linking injunctive and restitutionary relief. On its face, section 17203 appears to authorize "injunctive relief to prevent [unfair competition], *and/or* restitution (i.e. disgorgement) of money or property wrongfully obtained." (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229], italics added.)

The appellate court below did not discuss the statutory language, relying instead on three prior cases: *People* v. *Superior Court (Jayhill)* (1973) 9

---

[10]In its brief, MECA also contends certain allegations in ABC's current and superseded complaints contradict and "negate" ABC's necessary allegations of competitive injury (at any level) and secrecy. The issues thus raised were not among those specified in the petition for review or the answer, and are not fairly included in them. (See Cal. Rules of Court, rule 29.3(c).) We decline to expand the scope of review.

[11]Section 17200 defines "unfair competition," for purposes of the code chapter that includes section 17203, to include any unlawful business act or practice. In its second cause of action, ABC alleged MECA's violation of section 17045 constituted unfair competition within this definition.

Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191] (hereafter *Jayhill*), *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51] (hereafter *Fletcher*), and *People* v. *Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330 [3 Cal.Rptr.2d 34] (hereafter *Powers*). MECA relies on the same cases.[12] None of those decisions, however, holds—or even states in dictum—that restitution or disgorgement under section 17203 is contingent on injunctive relief.

In *Jayhill*, this court considered the availability of restitution under section 17535, which, in language similar to that of 17203, sets out remedies for fraudulent advertising. At the time the complaint was filed, section 17535 provided only that violations could be enjoined, making no reference to restitution. (9 Cal.3d at p. 286.) We observed, however, that the statute did not purport to *restrict* a court's equitable powers, and concluded that, in the absence of such restriction, a court of equity retained the "full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." (*Ibid.*) An order for restitution, therefore, was within the court's power. Although in *Jayhill* an injunction had been sought and allowed, and we therefore described restitution as "a form of ancillary relief" (*ibid.*), we did not hold or state that a court would lack the power to issue a restitutionary order under section 17535 if no injunction were also sought.

In *Fletcher*, this court again construed section 17535. Although we again described restitution as "a form of ancillary relief in such an injunctive action" (23 Cal.3d at p. 454), we did not hold or assert that restitution was permitted *only* as ancillary relief. The question under discussion, moreover, was not whether restitution is available as an independent remedy, but whether it is available in a class action without proof that each individual plaintiff lacked knowledge of the fraudulent nature of the practice when he

---

[12]MECA also cites and provides the court with selected staff analyses, reports and letters accompanying the 1976 amendment of section 17203 by which the explicit authorization for restitutionary relief was added. None of them discuss the question before us, although the language of some reveals the authors' *assumptions* that restitution would be ancillary to an injunction. Whatever value these materials might have provided in resolving the present question evaporates upon examination of other reports, analyses and letters cited and provided by an amicus curiae supporting ABC's position—materials that, in some cases, reflect the opposite assumption as to the independence of restitution from injunctive relief, and in other cases neutrally describe the proposed amendments without making any such assumption. Neither set of legislative materials indicates the Legislature actually considered and resolved the question before us. (See *California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 648 [59 Cal.Rptr.2d 671, 927 P.2d 1175] ["we hesitate to accord much weight to an anonymous staff report that was merely summarizing the effect of a proposed bill"].)

or she did business with the defendant. (*Id.* at pp. 449-454.) We held the lack of such proof was not fatal to certification of the class; section 17535, we explained, "authorizes a trial court to order restitution in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." (*Fletcher, supra,* 23 Cal.3d at p. 449.)

Finally, in *Powers,* the Court of Appeal held an order for disgorgement or restitution of illegal profits was permitted under section 17203, despite the lack of specifically identifiable victims who lost money as a result of the defendant's unfair business practice (sale of designated moderate-income housing units at illegally high prices). (2 Cal.App.4th at pp. 339-344.) As an injunction had also been sought and granted in that case, the appellate court described the order for disgorgement or restitution as "a form of relief ancillary to an injunction" (*id.* at p. 341), but nothing in the opinion states or suggests restitution under section 17203 is *restricted* to such a circumstance. Rather, the *Powers* court, like this court in *Fletcher,* stressed the independent deterrent value of restitutionary orders: "[T]he laws against unfair business practices were drafted in large part to prevent a wrongdoer from retaining the benefits of its illegal acts. That purpose would be frustrated if a party were entitled to retain its profits simply because it is difficult to specify the victim." (*Powers, supra,* 2 Cal.App.4th at pp. 341-342.) Simply stated, "the necessity for deterring future acts require[s] that the wrongdoer be prevented from retaining the illegal profits." (*Id.* at p. 343.)

*Fletcher, Jayhill* and *Powers* provide insufficient reason to read a restriction on relief into the statute. Indeed, ABC and the Attorney General, appearing as an amicus curiae, argue that the deterrent policy expressed in *Fletcher* and *Powers* supports *their* interpretation of section 17203. We agree; it is unlikely the Legislature, in providing courts with broad equitable powers to remedy violations under section 17203, intended those powers be limited in an illogical, unfair and counterproductive manner. As the Attorney General explains, "[o]ften, no logical connection exists between an order of restitution or disgorgement of *past* illicit gains and an injunction addressing *future* conduct. Sometimes, a court may find that an injunction is moot as a practical matter, for example because of the age, illness, disability or even death of the defendant. In other circumstances, a court may find that an injunction is unwise or impractical because of the difficulty of enforcement, for example when the defendant is located out of state. Occasionally, a court is disinclined to issue an injunction because of the technical expertise needed for proper enforcement . . . . In other situations, a court may find that an injunction may not be the most appropriate remedy to redress unfair practices committed only during a brief and unique circumstance involving a

change in business circumstance, such as the acquisition or spin off of another company. In all of these cases, however, the offender is not entitled to keep the fruits of its unfair, deceptive, or unlawful conduct. The defendant's victims may be entitled to restitution, and the court may also conclude that deterrence is more effectively accomplished through restitution than through an injunction of little practical significance." MECA's interpretation of section 17203 would frustrate the deterrent purposes of restitution by allowing a defendant who successfully opposed an injunction to retain its illicit profit.

For the above reasons, we conclude section 17203 authorizes a trial court to order restitution of money lost through acts of unfair competition, as defined in section 17200, whether or not the court also enjoins future violations.[13] The Court of Appeal erred in concluding otherwise.

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred.

MOSK, J.—I concur in the opinion of the court prepared by Justice Werdegar. It addresses all the questions presented in this cause, and answers them correctly. Of course, issues remain for resolution in the future. On its face, or only slightly underneath, Business and Professions Code section 17045 requires unfair competition, injury to a competitor, and a tendency to destroy competition. It implicitly defines "unfair competition" as secret discrimination by a seller between or among its buyers. It similarly defines "injury to a competitor" as harm to a competitor of either the seller or a favored buyer. By contrast, it does not define a "tendency to destroy competition." Whether the phrase should be understood so as to further "[c]onsumer welfare," which is "a principal, if not the sole, goal of antitrust laws" (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 918 [221 Cal.Rptr. 575, 710 P.2d 375]), and to prevent "output restriction," which is "one of their principal targets" (*State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1183 [252 Cal.Rptr. 221, 762 P.2d 385] (conc. and dis. opn. of Mosk, J.))—as it apparently should be—is a question for another day.

---

[13]In light of our conclusion, we need not address the question whether ABC should have been permitted to amend its complaint to seek an injunction. Nor do we address MECA's contention ABC has "disguised" a claim for damages as one for restitution. To the extent MECA's unelaborated assertion can be understood, it appears to dispute ABC's ability to *prove* MECA illegally enriched itself at ABC's expense, rather than the sufficiency of the complaint to state a cause of action.

BROWN, J., Dissenting.—The declared purpose of the Unfair Practices Act is to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition." (Bus. & Prof. Code, § 17001.) In pursuit of that goal, the act prohibits the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . to the injury of a competitor and where such payment or allowance tends to destroy competition . . . ." (Bus. & Prof. Code, § 17045; hereafter all undesignated statutory references are to the Business and Professions Code.) Given the ordinary rules of English usage, this prohibition is implicated only by competitive injury to a competitor of the one prohibited. Such a result is abhorrent to the majority. It suggests that some victims of commercial discrimination might have no remedy under the act. The quixotic desire to do good, be universally fair, and make everybody happy is understandable. Indeed, the majority's zeal is more than a little endearing. There is only one problem with this approach. We are a court.

As a court, we are constrained to work with the tools available and to play by the rules. When the task is statutory construction, our inquiry begins with the words of the statute. It ends there if the words are sufficient. The majority's insistence on "interpreting" the unambiguous language of section 17045 prompts me to repeat Justice Frankfurter's tongue-in-cheek advice for a court with an overactive lawmaking gland: "[W]hen the legislative history is doubtful," he wrote, "go to the statute." (*Greenwood* v. *United States* (1956) 350 U.S. 366, 374 [76 S.Ct. 410, 414-415, 100 L.Ed. 412].)

Here, of course, lacking even the guidance a legislative history of section 17045 would furnish, there is all the more reason for a cautious fidelity to the text of the statute. Undaunted, the majority creates doubt where none exists and, marshaling a patchwork of secondary comments that provide no *clear* evidence of what the Legislature had in mind in 1933, jettisons the settled understanding of the statute more than half a century after it was passed. By reading the language of section 17045 as referring to competitors of those who *receive* prohibited price discounts, the majority introduces into the statute an ambiguity that is not present if the words are taken to mean what they say. To use rules of statutory construction to *create* ambiguity is perverse. The sole justification of the canonical apparatus is to remove doubt, ambiguity, or uncertainty where they exist.

Apart from a couple of exceptions that only serve to prove the rule, in the more than 60 years that the price discrimination provision of the Unfair Practices Act has been on the books, neither the Legislature, this court, the antitrust bar nor the business community has regarded it as applying to

so-called "vertical" price discrimination. Indeed, the decision which until today had been regarded as the definitive opinion on the scope of the act reached the *opposite* conclusion. (*Harris* v. *Capitol Records etc. Corp.* (1966) 64 Cal.2d 454 [50 Cal.Rptr. 539, 413 P.2d 139] (hereafter *Harris*).) In a striking reversal of settled law—notable as much for its retrospective *rein*terpretation as for its result—the majority abandons that orthodox view and strikes out along a path that is not only contrary to the language of the statute itself, but one whose underlying view of economics has been repeatedly repudiated by national authorities on antitrust policy as "giv[ing] artificial protection to the individual competitor" (Oppenheim, *Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy* (1952) 50 Mich. L.Rev. 1139, 1201 (hereafter Oppenheim)); "unleavened by economic understanding" and "safeguard[ing] not competition, but competitors" (Adelman, *Effective Competition and the Antitrust Laws* (1948) 61 Harv. L.Rev. 1289, 1328, 1335); and as "antithetical to antitrust policy and unnecessary for antitrust enforcement" (Rowe, *Price Discrimination, Competition, and Confusion: Another Look at Robinson-Patman* (1951) 60 Yale L.J. 929, 974, fn. omitted); indeed, the United States Supreme Court has described the interpretation espoused by the majority as promoting "a price uniformity and rigidity in open conflict with the purposes" of the antitrust laws. (*Automatic Canteen Co.* v. *F.T.C.* (1953) 346 U.S. 61, 63 [73 S.Ct. 1017, 1019, 97 L.Ed. 1454].)

The majority reaches its conclusion by ignoring a bedrock rule of statutory interpretation: Where there is no ambiguity, there is nothing to "interpret"— the statute means what it says. Once free of the inconvenient impediments presented by a straightforward text, the majority indulges in an extravagant bout of post hoc judicial lawmaking. Long after the events that provoked section 17045 have passed from memory, the majority imbues the statute with a sweeping scope that is not only unwarranted by its language, but protectionist and anticompetitive in effect.

This case involves competition among distributors of the *same* product, competition that cannot conceivably have any significant effect on the touchstones of antitrust policy—interbrand competition, the structure of competitive markets, and the ultimate economic welfare of the California consumer. With the utmost respect for the views of my colleagues, I fear today's decision will not only eliminate price discounts as a means of enhancing competition; it will encourage precisely the kind of vexatious and costly litigation which serves only to burden the economy.

I

*The Text of Section 17045*

On its face, the language of section 17045 indicates a legislative concern with the business practices of *sellers*, rather than purchasers. The operative language condemns the *"allowance* of . . . discounts . . . to certain purchasers . . . not *extended* to all purchasers purchasing upon like terms and conditions . . . ." (Italics added.) These words evince a concern on the part of the drafters of section 17045 with the conduct of the party *allowing* or *extending* a discount or rebate, that is, with sellers. For the prohibition applies only to them and not, at least by the statute's express terms, to those who *receive* the price discount—purchasers. That conclusion, read in light of the act's overriding purpose of enhancing competition, suggests it is anticompetitive conduct with respect to *other* sellers that triggers a violation of the statute, a reading that tends to confirm its horizontal focus. Moreover, the statute condemns only those price discounts resulting in an "injury . . . to . . . competition." Although it may be possible to read this language as directed at injury to competitors *of the buyer*, such a reading is a stretch. The more natural sense of the text, given the several references to the conduct of sellers and the absence of a buyer referent, is that section 17045 is directed at injuries to competitors of the party "extending" or "allowing" the discount or allowance; again, other sellers.

Thus, a seller who grants a price discount to less than all of its customers commits an unlawful act, provided the discount injures a competitor *and* tends to destroy competition. Neither of these two qualifying phrases suggests to me (or, I imagine, to the ordinary reader) that the use of these words was meant to refer to "competitors" of the *purchaser* to whom the discount was given, or to "destroying competition" among *purchasers* from the seller. A more natural sense of the words is that they refer to competitors of the party granting the price discount—the one referred to earlier in the sentence —sellers who "pay," "allow," or "extend" the prohibited discount.

The majority reasons that because section 17045 is "focused patently on discrimination among purchasers," it is reasonable to assume that the Legislature had their interests in mind in enacting the prohibition on price discrimination. (Maj. opn., *ante*, at p. 1254.) Yes and no. Purchasers are mentioned, as they would have to be in any statute whose subject is a bilateral transaction, but only because purchasers are essential to *any* sale, discriminatory or not. Beyond that, however, there is no basis in the statutory language itself to warrant the conclusion that a prohibition on *granting*

a price discount was intended for the protection of those purchasers not receiving it.

The majority also reasons that section 17045 contains no "express restriction" to horizontal injury. (Maj. opn., *ante*, at p. 1254.) Granted, the statute does not affirmatively state that competitive injury to buyers is *insufficient* to plead a cause of action, but it would be both odd and unnecessary if it went out of its way to do so. Conceding that the language of section 17045 "does not contain an explicit reference to secondary line competitive injury like the . . . language of the Clayton and Robinson-Patman Acts," the majority declares that "the absence of a specific reference does not . . . constitute an implied restriction." (Maj. opn., *ante*, at p. 1255.) This is said to be so because the statute "requires injury to a 'competitor,' and a tendency to destroy 'competition,' without any further inclusive *or* restrictive language delineating the scope of those terms." (*Ibid.*, italics in original.)

In the context of another statute, one not focused so "patently" on the conduct of those who "pay," "allow," or "extend" discounts, such reasoning might persuade. But here, the language of the statute *does* contain a "specific reference" which, in context, *does* "constitute an implied restriction." That reference is to those who make the payments, allow the rebates, or extend the privileges made unlawful; in a word, sellers. The statute's "evident concern with discrimination between competing purchasers," the majority concludes, "suggests its intended protection extends to such competition." (Maj. opn., *ante*, at p. 1255.) But *what* "evident concern," apparent on the surface of the statute, does the majority have in mind? A disinterested reader of the text, I suggest, would come away with a clear impression, not of an "evident concern" with purchasers, but with those who "grant," "pay," or "allow" discounts and *their* competitors. It strikes this reader as improbable to conclude that the words "competition" and "competitor" refer, not to competitors of the price-cutting seller, which may suffer commercial injury as a result of such a practice, but to competitors of the *purchaser*. Sellers, of course, do not compete with buyers but with other sellers, *their* "competitors," and it is to them that the statute evidently refers.

Had the Legislature intended the statute to apply to competitors of purchasers receiving prohibited discounts, it would have been easy enough to insert language in section 17045 making that point clear. Indeed, three years after section 17045 was passed, Congress passed the Robinson-Patman Act, outlawing price discounts on goods in interstate commerce. That legislation, however, left no doubt whatever that *its* prohibition applied to those who *received*, as well as those who granted, discounts. How did Congress express

such a "bilateral" prohibition? Quite simply. By making unlawful price differences which injure competition "with any person who grants or . . . *receives*" their benefit. (15 U.S.C. § 13(a), italics added.)

## II

*Harris v. Capitol Records*

Some 30 years ago, Justice Mosk, writing for a unanimous court in *Harris*, *supra*, 64 Cal.2d 454, described the Unfair Practices Act—including section 17045—as intended to proscribe only *horizontal* price discrimination, that is, differences in the price a seller charges buyers, the *effect* of which is to impair competition with other *sellers*. He wrote that "[t]hroughout the Act the Legislature has manifested its intent to discourage practices which injure the *seller's* competitors (§§ 17040, 17043, 17045, 17071) and thereby tend to create the monopolies condemned by section 17001 . . . . Together these constitute the 'horizontal' concept of price regulation, one of the fundamental characteristics of this legislation. In his exhaustive study entitled *Experience in California With Fair Trade Legislation Restricting Price Cutting* (1936) 24 Cal.L.Rev. 640, 686, Professor Ewald T. Grether explained: 'Whereas the Fair Trade Law has to do with *vertical* price relations, the Unfair Practices Act operates *horizontally*.' (Italics in original.) And in Cupp, *The Unfair Practices Act* (1936) . . . 10 So.Cal.L.Rev. 18, the author said that 'The act may be said to be the consummation of years of effort by businessmen to carry out the horizontal concept of trade regulation.' More recently, it has been pointed out that . . . the Unfair Practices Act 'protects only first-line competition against predatory price cutting on an area basis and does not make illegal price discriminations which only injure second or third-line competition at the buyer level or lower. . . . [A] seller can lawfully discriminate in favor of one of his purchasers for the purpose of enabling that purchaser to meet his competition, so long as there is no intent on the part of the seller to prevent or destroy the competition of other sellers at his level.' (Bermingham, *Legal Aspects of Petroleum Marketing Under Federal and California Law*[s] (1960) 7 U.C.L.A. L.Rev. 161, 246-247.)" (*Harris*, *supra*, 64 Cal.2d at pp. 461-462, first italics added.)

From the context in which these statements appear, it is clear that Justice Mosk was speaking of the Unfair Practices Act as a whole ("Throughout the Act"), characterizing it as fundamentally "horizontal" in effect. (*Harris*, *supra*, 64 Cal.2d at p. 461.) I cannot subscribe to the majority's dismissal of those statements in *Harris*, *supra*, 64 Cal.2d 454, as standing for something other than what their ordinary meaning conveys. Not only Justice Mosk's

statement, but also the authorities he relied on in support of it, make an unqualified case for a horizontal interpretation of the Unfair Practices Act as a whole, including section 17045. The article by Professor Ewald T. Grether, for example, discusses the near concurrent rise of state fair trade statutes, companion legislation to the national outbreak of unfair competition laws in the 1930's. "The Unfair Practices Act," Grether concluded, "represented the culmination of legislation begun in 1913. . . . The core of this act was a provision"—now section 17040—"declaring it unlawful to discriminate between different sections, communities, cities or between different locations in the state by selling at a lower rate . . . 'with the intent to destroy the competition of any regular established dealer.'" (Grether, *Experience in California With Fair Trade Legislation Restricting Price Cutting* (1936) 24 Cal.L.Rev. 640, 645, italics omitted (hereafter Grether).)

As Grether's comments indicate, a consistent theme—restraints on *horizontal* price discrimination—runs through the act from its origin in 1913 to 1935, the year in which its major provisions were consolidated. As the Sherman and Clayton Acts were aimed at structural reforms of the economy by promoting horizontal competition, so state antitrust legislation—including California's act of 1913—was aimed at thwarting the growth of monopolies and business combinations that had a restraining effect on competition among *sellers*. Like the federal antitrust acts of the same era, these state antitrust statutes were aimed at prohibiting so-called locality or area price discrimination, the paradigmatic condition for the rise of cartels. (See, e.g., 3 Kintner, Federal Antitrust Law (1984) § 19.1, pp. 42-50 & accompanying fns. (hereafter Kintner).) As the majority points out, the act of 1931, popularly named the "Anti-Discrimination Act" (Stats. 1931, ch. 617, pp. 1333-1335), was aimed primarily at these "large scale distributors, especially chain store systems." (Grether, *supra*, 24 Cal.L.Rev. at p. 645.) It carried forward the proscription on geographic price discrimination of the original 1913 act and coupled to it, in amendments adopted in 1933, two significant additions—the prohibition on "secret rebates" (now § 17045), and a provision prohibiting sales below cost (now § 17043). (Stats. 1933, chs. 261, 504, pp. 793, 1280-1281; see Wilson, *California Unfair Practices Act and Fair Trade Act* (1941) 27 ABA J. 249.) Throughout this series of amendments, however, there is nothing to indicate that the legislation lost its original horizontal focus. In particular, there is no convincing basis in the text of section 17045 to indicate that the Legislature had adopted the vertical prohibitions on price discrimination that were soon to appear in section 2(a) of the federal Robinson-Patman Act. Parallel events suggest the contrary.

Almost concurrently with the consolidation of what is now the Unfair Practices Act, the Legislature enacted the "Fair Trade Act" (Stats. 1931, ch.

278, p. 583; Stats. 1933, ch. 260, p. 793), legislation that was expressly vertical in orientation.[1] The product of pressure by the same retailers and distributors threatened by the chains who pushed for the Unfair Practices Act, the fair trade movement had been popularized by the National Industrial Recovery Act (Act of June 16, 1933, ch. 90, 48 Stat. 195), Depression-era legislation authorizing the establishment and self-policing of "codes of competition" designed to prohibit "unfair competitive practices." Fair trade legislation, which swept the states in the 1930's, was not antitrust legislation in the classic mold of the Sherman, Clayton and Federal Trade Commission Acts of the monopoly era. It was directed at providing relief to distributors and small retailers, squeezed more than ever by a weak economy and the highly competitive chains. Rather than seeking to promote a structurally competitive *market*, fair trade and similar legislation was aimed at relieving the pressure on the individual competitor—permitting floors to be set on prices, for example, and authorizing resale price maintenance—thus in a sense *restraining* competition. (See, e.g., Rowe, *Price Discrimination, Competition, and Confusion: Another Look at Robinson-Patman, supra*, 60 Yale L.J. at p. 1067; Oppenheim, *supra*, 50 Mich. L.Rev. at pp. 1198-1202.)

As Grether summarized the situation in 1936, "[I]t is . . . essential to note that these statutes [i.e., the Unfair Competition and Fair Trade Acts] were promulgated during depression years. Both the vigor of the demands and the weakness of opposition were decidedly tempered by the condition of the glutted market. The impact upon the legislature showed itself not only in the fair trade acts, but in a great number of measures aimed at economic control. Apparently, legislators had accepted the proposition that price cutting in the distributive trades engenders a series of repercussions that react harmfully upon primary producers." (Grether, *supra*, 24 Cal.L.Rev. at p. 648, fn. omitted.) Contrasting the California fair trade and unfair practices legislation, Grether pointed to the differing orientation and scope of the two trade regulation acts: Although it applied vertically, the Fair Trade Act reached only a select group of commodities—those that were trade- or brand-marked. The "horizontal procedure under the Unfair Practices Act," Grether wrote, "may develop possibilities for wider, perhaps, even general application, in

---

[1]Prior to its repeal in 1975 (Stats. 1975, ch. 402, p. 878), section 1 of the Fair Trade Act declared legal contract terms for the sale of "commodit[ies]" by which the buyer agreed not to resell "except at the price stipulated by the vendor," and authorized buyers to require their buyers "to agree that [they] will not, in turn, resell except at the price stipulated by such vendor or by such vendee." (Stats. 1931, ch. 278, § 1, p. 583.) As Grether pointed out, "The vertical nature of the rights under the [Fair Trade] [A]ct are clearly indicated by Section 2: 'This act shall not apply to any contract or agreement between producers or between wholesalers or between retailers as to sale or resale prices.'" (Grether, *supra*, 24 Cal.L.Rev. at p. 641.)

contrast to the relatively limited possibilities of the Fair Trade Act. The strength of the Unfair Practices Act is that action under it need not wait upon the initiative of manufacturers or distributors at the apex of the distributive pyramid but may arise at any level, and that it is not limited merely to trade-marked, identified goods." (Grether, *supra*, 24 Cal.L.Rev. at p. 686.)

The majority dismisses these comments as of marginal value in reaching an understanding of the scope of the act. (Maj. opn., *ante*, at pp. 1265-1266.) I disagree. It was not until 1936 that congressional passage of the Robinson-Patman Act, validating vertical restraints by extending prohibitions on discriminatory pricing to those granting or *receiving* discounts, or customers of either, set the stage for a rush of similar state statutes. (See Kintner, *supra*, § 19.1, pp. 47-50.) Although some of these state acts were modeled on the "vertical" Robinson-Patman Act, others, enacted earlier in the decade, including our own act, carried forward the original horizontal antidiscrimination model. (See Comment, *Prohibiting Price Discrimination and Sales Below Cost: The State Unfair Practice Acts* (1938) 32 Ill. L.Rev. 816; 819-820, fn. 5; see also *Harris, supra*, 64 Cal.2d at p. 459, fn. 5 ["By contrast [to the Unfair Practices Act], as of 1938 seven states specifically prohibited discrimination between purchasers as well as between localities."]; McAllister, *Price Control by Law in the United States: A Survey* (1937) 4 Law & Contemp. Probs. 273, 298 (hereafter McAllister) ["The [California] Unfair Practices Act is directed at the horizontal level of prices and, unlike the Fair Trade Act, it applies to all goods. . . . Another provision outlaws price discrimination 'with the intent to destroy . . . or to prevent the competition of any person' but this precursor of the Clayton and Robinson-Patman Acts has long been familiar in state anti-trust laws."].)[2]

It is possible that the available extrastatutory materials Justice Mosk relied on in *Harris, supra*, 64 Cal.2d 454, are simply too equivocal to establish

---

[2]Opinions from other jurisdictions with unfair competition statutes of the same provenance as the California act follow the horizontal interpretation we adopted in *Harris, supra*, 64 Cal.2d 454, often relying on our opinion. In *Beam* v. *Monsanto Co., Inc.* (1976) 259 Ark. 253 [532 S.W.2d 175, 181-182], for example, the Arkansas Supreme Court wrote that "It is apparent that the [Unfair Practices Act] is intended to foster competition for the primary benefit of the general public by protecting dealers . . . from unfair competition by large dealers. . . . Appellants' argument for 'vertical competition' would broaden the Act to not only protect dealers . . . from unfair competition by other dealers, but would also protect buyers from competition by [other] business buyers who use and purchase the same . . . product for use in their . . . businesses." (See also *Carlock* v. *Pillsbury* (D.Minn. 1989) 719 F.Supp. 791, 849 [applying *Harris* to state-based unfair practices claim]; *USA Petroleum Co.* v. *Atlantic Richfield Co.* (C.D.Cal. 1983) 577 F.Supp. 1296, 1307 [distinguishing *Harris* in a "true" horizontal case]; *Chapiewsky* v. *G. Heilemann Brewing Co.* (D.Wis. 1968) 297 F.Supp. 33, 41 [following *Harris*]; *William Ingliss, etc.* v. *I.T.T. Continental Baking Co.* (9th Cir. 1982) 668 F.2d 1014 & *William Inglis & Sons* v. *Continental Baking* (9th Cir. 1991) 942 F.2d 1332 [relying on *Harris* as to state law claims]; *Burge* v. *Pulaski County Special Sch. Dist.* (1981)

satisfactorily the Legislature's intent, one way or the other. If so, our response ought to be a refusal to extend the act beyond the horizontal view, one that is supported by the words of section 17045, is consistent with the act's purpose of enhancing competition, and is congruent with the ruling horizontal orthodoxy of the day—precisely the view reflected in *Harris* itself. If that cautious view turns out to be mistaken, Justice Mosk prescribed the appropriate remedy in *Harris*: "Plaintiff complains that this [horizontal] construction of the Act will allow a predatory company 'to vertically feed on those beneath it.' Such arguments should be addressed to the Legislature, which alone is equipped to determine the gravity of the economic evil here alleged, and to take such steps as it deems appropriate." (*Harris, supra*, 64 Cal.2d at p. 462, fn. omitted.)

## III

### *Vertical Restraints on Price Competition*

It is worth pointing out just how far from the contemporary antitrust mainstream the majority's construction of California's Unfair Practices Act strays. (See, e.g., *Continental T.V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 54 [97 S.Ct. 2549, 2559-2560, 53 L.Ed.2d 568] ["Vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers. . . . [¶] [Such] restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products."]; Bork, *Vertical Restraints: Schwinn Overruled* (1977) Sup. Ct. Rev. 171;

---

272 Ark. 67 [612 S.W.2d 108] [Arkansas Unfair Practices Act applies only horizontally]; *Rose* v. *Vulcan Materials Co.* (1973) 282 N.C. 643 [194 S.E.2d 521, 67 A.L.R.3d 1] [same].)

This account of the scope of unfair practice provisions of other states differs, it is apparent, from the majority's evaluation. (Maj. opn., *ante*, at p. 1261, fn. 6.) The Eighth Circuit Court of Appeals' gloss on the Arkansas act, cited by the majority, merely declares, without analysis or discussion, that it was passed in 1937 shortly after the Robinson-Patman Act, "and was obviously designed to prohibit similar types of business conduct." (*Ideal Plumbing Co.* v. *Benco, Inc.* (8th Cir. 1976) 529 F.2d 972, 978, fn. 7 [42 A.L.R.Fed. 266].) I am persuaded by the contrary reasoning and result of the Arkansas cases cited above interpreting that state's statute as "horizontal." The opinion of the Wyoming Supreme Court in *State* v. *Langley* (1938) 53 Wyo. 332 [84 P.2d 767], also cited by the majority, involved a criminal prosecution under a statute prohibiting sales below cost; although a provision of the statute contains language similar to section 17001, the opinion is too obscure to stand for much, other than the statement that the provision prohibiting such sales "was probably intended mainly for" the independent merchant. (84 P.2d at p. 774.) The price discrimination provision of the Wisconsin act, also cited by the majority, is almost identical to section 17045, and at least one Wisconsin appellate court has construed it as applying vertically. (*Jauquet Lumber* v. *Kolbe & Kolbe Millwork* (1991) 164 Wis.2d 689 [476 N.W.2d 305, 309].) As noted, however, the Arkansas statute, also modeled on the California provision (see McAllister, *supra*, 4 Law & Contemp. Probs. at p. 298, fn. 141), has received a contrary construction.

Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality* (1981) 48 U.Chi. L.Rev. 6; 8 Areeda, Antitrust Law (1989) § 1609e, pp. 139-143.) Whatever its business motivation, the alleged price differential at issue in this case reflects an implicit preference for two distributors of the same brand of telephone over a third. I find it difficult to comprehend how a discount offered to some but fewer than all distributors of the same product can even affect, much less "tend to destroy" the only kind of competition that matters to the consumer—competition among brands.

If the net economic effect on the retail buyer of telephones of a price differential between intrabrand competitors is nil, how can competition in any sense that justifies "trundling out the great machinery of antitrust enforcement" (*Valley Liquors, Inc.* v. *Renfield Importers, Ltd.* (7th Cir. 1982) 678 F.2d 742, 745) have been affected by the allegedly discriminatory price involved here? It seems evident that competition among manufacturers of telephones and related consumer electronic goods is robust, and that nothing respondent does in its dealings with distributors of its own products is likely to affect significantly that hard economic fact. The lesson in all of this is one that belies the majority's tautology that "competition is competition." (Maj. opn., *ante*, at p. 1262.) For antitrust purposes at least, it is not necessarily so. (See, e.g., *Valley Liquors, Inc.* v. *Renfield Importers, Ltd.*, *supra*, 678 F.2d at p. 745 ["We reject the casual equation of intrabrand price competition with interbrand competition. . . . The plaintiff in a restricted distribution case must show that the restriction he is complaining of was unreasonable because, weighing effects on both intrabrand and interbrand competition, it made consumers worse off."]; Bork, *Vertical Restraints: Schwinn Overruled*, *supra*, Sup. Ct. Rev. at p. 172 ["The Court's *Sylvania* opinion not only counted efficiencies in favor of a challenged business practice but did so in a sophisticated way, perceiving that the elimination or mitigation of competition among a manufacturer's dealers was essential to the achievement of certain distributional efficiencies."].) In this very case, the majority imposes a ban on vertical, intrabrand price differences as a legitimate business method, an interpretation that may not only hobble structural competition, but may also fuel claims of California's "unfriendly" regulatory and legal climate. On the basis of what appears to be some misplaced principle of distributive equality, the majority today virtually rules out vertical price differences as a method of *enhancing* competition.

The conclusion that there is no sound basis in the text of the statute or relevant materials for the idea that in enacting the Unfair Practices Act the Legislature anticipated the vertical, secondary line innovations introduced

three years later in the Robinson-Patman Act, is reinforced by these views of national authorities on antitrust and trade regulation policies. If vertical restrictions on price discrimination are both anticompetitive in effect and protectionist in intent, then the Legislature's explicit declaration in section 17001 of an intention to "foster competition" is thwarted by the majority's innovative gloss on section 17045. We ought to be especially reluctant to engraft onto the statute so dramatic and counterproductive a policy innovation, doubly so in the absence of a *clear* legislative directive.

CONCLUSION

There is a lesson in the half-century-plus of legislative inactivity since section 17045 was enacted; unfortunately, it is one lost on the majority. Today's result is not only bad law, it is demonstrably bad policy and even worse economics. Why? Because the fundamental aim of antitrust legislation is to protect the competitive process. Protecting the individual business from the benefits of competition will cost the California consumer in the form of higher prices; it will cost the state as a whole in a flood of wasteful price discrimination litigation unrelated to the only goal section 17045 was meant to protect—a competitive *market.*

For that constituency whose interests alone justify legislative intervention in market-pricing forces—the California consumer—price competition, including discounts, is an unmixed good. It lowers prices and maximizes buying power. Yet the majority condemns it, rewriting the act in the process, to import a construction that is not only bad economics but questionable policy as well. For object lessons we need look no further than the national experience with the heavily criticized Robinson-Patman Act. Confronted with a text that fails to support the majority's construction, and the likelihood of anticompetitive consequences, we ought to pause to consider whether we do more harm than good.

I dissent.