[No. A042063. First Dist., Div. One. Jan. 2, 1992.]

THE PEOPLE, Plaintiff and Appellant, v.
THOMAS SHELTON POWERS, M.D., INC., et al., Defendants and
Appellants.

**COUNSEL**

Arlo Smith, District Attorney, and David C. Moon, Assistant District Attorney, for Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Herschel T. Elkins, Assistant Attorney General, and Ronald A. Reiter, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Appellant.

Eisenberg, Axelrod & Highlander, Neil D. Eisenberg, Harry Pollack, Stephen R. Leopold, Lynn L. Axelrod, Judy E. Highlander and Eunice Calvert-Banks for Defendants and Appellants.

## OPINION

STEIN, J.—The superior court determined that Thomas Shelton Powers, M.D., Inc., and 560 Presidio, Inc., acting jointly and severally,[1] had violated the provisions of San Francisco's Subdivision Code (Subdivision Code) by selling seven condominium units designated as moderate income housing stock at prices exceeding those allowed by the code. The court further determined that the sales were unfair business practices and, accordingly, (1) enjoined the defendants from any further like practices, and (2) assessed against them a statutory civil penalty of $2,500 for each sale. (Bus. & Prof. Code, § 17206.) San Francisco appealed from the judgment insofar as the court limited the relief granted. The defendant corporations filed a cross-appeal from the judgment on the grounds that the court had incorrectly determined that the sales were governed by a 1979 amendment to the Subdivision Code.

We concluded that the sales indeed were regulated by the 1979 amendment, and further that the trial court had incorrectly found that its power to grant appropriate relief was limited to an injunction and imposition of civil penalties. The Supreme Court granted review and retransferred the matter to us with directions to vacate our decision and to reconsider the cause in light of *City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184 [278 Cal.Rptr. 375, 805 P.2d 329]. We have done so and further have considered the supplemental arguments made by the parties. We conclude that *City of West Hollywood* does not require us to depart from our original conclusion.

### FACTUAL/PROCEDURAL BACKGROUND

Thomas Shelton Powers was the general partner of P & P Investors, Ltd., which purchased an eight-unit apartment building located in San Francisco. In November 1977, P & P Investors, Ltd., applied to the City and County of

---

[1]The court's conclusion that the defendants acted jointly and severally derived from its conclusion abundantly supported by the evidence that the defendants were the alter egos of one another.

San Francisco for a permit to convert the apartments to condominiums. In March or April 1978, P & P Investors, Ltd., filed a tentative map for the conversion with San Francisco's planning commission. On May 11, 1978, the city planning commission approved the tentative map, passing a resolution which allowed the building to be rezoned for condominium conversion on the condition, among others, that each unit be priced for purchase by persons of low- or moderate-income.[2] In March or April 1978, P & P Investors, Ltd., filed a tentative map for the conversion with San Francisco's planning commission. The following June, Dr. Powers, on behalf of P & P Investors, Ltd., signed off on a final map, which contained the following provision:

"NOTE: ALL THE UNITS SHOWN ON THIS MAP HAVE BEEN DESIGNATED AS THE CITY'S PERMANENT LOW AND MODERATE INCOME HOUSING STOCK."

In signing off on the map, P & P Investors, Ltd., expressly agreed to adhere to all the conditions of the May 11, 1978, resolution and also to any applicable provisions of San Francisco's Subdivision Code. The relevant code provisions were contained in section 1385, subdivision (b), which simply provided, ". . . If the Commission determines that any unit to be converted is part of the City's low or moderate income housing stocks, then the price of the unit upon conversion shall not be such as to remove it effectively, from said low or moderate income housing stocks."

Accordingly, as of June 1978, P & P Investors, Ltd., had obtained permission to convert the units to condominiums, and had agreed, and was required as a condition of approval, to price each unit to reflect its status as low- or moderate-income housing. P & P Investors, Ltd., then sold its equity in the units to Thomas Shelton Powers, M.D., Inc., which thus acquired P & P Investors, Ltd.'s rights and obligations.

Subdivision Code section 1385, enacted to protect San Francisco's interest in ensuring that low- and moderate-income persons would be able to live within its boundaries, proved to lack important detail. It contained no formula for determining the price of a particular unit. Perhaps more significantly, it contained a loophole: by its terms it applied to the price of a unit upon conversion. It did not speak to any *resales* of that unit. Accordingly, persons purchasing units from a developer could then resell without restriction, profiting by removing the units from San Francisco's low- and moderate-income housing stock. The developers themselves could achieve the

[2]The resolution specifically provided, "The price of the units upon conversion shall not exceed $46,125.00." The amount stated was not intended to be an absolute ceiling on the price, but to reflect market prices for low- or moderate-income units.

same end by selling to a strawman; i.e., a separate entity owned by them, and then to the public. These flaws were remedied on July 6, 1979, when the Mayor of San Francisco signed an amended version of the Subdivision Code which, as relevant here, imposed price restrictions on resales as well as initial sales, and also set forth a formula for determining the price of units and provided that the units were to be sold to defined "qualified" households. In addition, San Francisco retained a right-of-first-refusal to purchase a unit at the original price plus reasonable adjustments for improvements, cost of living increases, etc. (Subd. Code, § 1341, subd. (c), and § 1385.)

Approximately two weeks later, and after the amended code provisions were in effect, Thomas Shelton Powers M.D., Inc., took out a building permit in order to bring the building up to code as a precondition to receiving final map approval. Six months later, on January 4, 1980, the proposed subdivision was indeed finally approved. The work was completed in May and the final map recorded in July. On September 11, 1980, the state issued its final subdivision report.

Thomas Shelton Powers, M.D., Inc., then sold the units in bulk to 560 Presidio, Inc., a corporation formed by Dr. Powers in October 1980. The units were sold for $61,531 each, which price apparently comported with the requirement that the units be priced as low- and moderate-income housing. 560 Presidio, Inc., then resold seven[3] of the eight units at prices ranging from $80,000 to $99,000—prices exceeding those set for low- and moderate-income housing units. The units were sold without having been offered to San Francisco as required by the code's "right-of-first-refusal" provisions.

The San Francisco District Attorney, representing the People of the State of California, thereafter filed against Powers, Thomas Shelton Powers, M.D., Inc., and 560 Presidio, Inc.,[4] a complaint for "Injunction, Restitution and Civil Penalties," alleging that the defendants had violated San Francisco's Subdivision Code, and in doing so had committed unlawful business practices. (Bus. & Prof. Code, § 17000 et seq.) The complaint prayed that the court enjoin the defendants from violating the code's provisions, that it assess against them a civil penalty of $2,500 for each unlawful business practice, and that it order them "to provide moderate income housing in San Francisco equal to that lost by the sale of the units at 560 Presidio, San Francisco, California, and to disgorge the profits obtained by selling said units at an excessive price." The court, as discussed above, found that the defendants had indeed violated the code, that the violations were unlawful

---

[3]The eighth unit was sold at the restricted price and is not at issue on the appeal.

[4]Hereafter, unless otherwise indicated, all defendants will be referred to collectively as defendants.

business practices and that appropriate relief therefore should be granted. The court accordingly granted the injunction and imposed the prayed-for civil penalties. It determined, however, that it had no power to grant relief such as disgorgement or restitution, and declined to do so. Both parties, as noted, appeal. We will first consider the issues raised by the cross-appeal.

### THE CROSS-APPEAL

Defendants' basic argument is that their actions were permissible under the 1975 version of the Subdivision Code in effect at the time that the proposed conversion was approved and the tentative map filed. They contend that the court's application of the 1979 version of the code was an impermissible, retroactive application of law. We disagree.

The power to enact laws includes the power to fix a future date on which a particular law will become operative. Where, however, that power has not been exercised, a statute ordinarily becomes effective on its operative date. (See *Johnston* v. *Alexis* (1984) 153 Cal.App.3d 33, 40 [199 Cal.Rptr. 909].) The operative date at issue here was July 6, 1979, and it was not specified that the 1979 amendment would become operative on some other date. Accordingly, any sale of a designated low- or moderate-income unit on or after July 6, 1979, was governed by the 1979 version of the code.

Defendants cite *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188 [246 Cal.Rptr. 629, 753 P.2d 585] to the effect that a law ordinarily will not be given retrospective application where such application will interfere with antecedent rights. (*Id.* at p. 1207.) The only right antecedent to the 1979 amendment, however, was that of Thomas Shelton Powers, M.D., Inc., to convert the units to condominiums on condition that they be sold as low- and moderate-income housing units. The 1979 amendment did not in any way interfere with that right. It simply affected the right of a subsequent purchaser to resell the units. The subsequent purchaser—560 Presidio, Inc.— had no interest in the units until *after* the 1979 amendment. 560 Presidio, Inc., therefore had no antecedent rights and, thus, no cause for complaint.

The issue is not, as defendants argue, whether the 1979 version of the code was applied retroactively—it was not. The issue, rather, is whether under the facts of this case, San Francisco should have been estopped from insisting that the defendants comply with the amended provisions. Phrased another way, the question is whether at least one of the defendants had obtained a vested interest to resell the units without restriction.

The general rule was stated by the court in *Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 867 [201 Cal.Rptr. 593, 679 P.2d

27]: "An equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1) a promise such as that implied by a building permit that the proposed use will not be prohibited by a class of restrictions that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment." Moreover, it is settled that "the rights which may 'vest' through reliance on a government permit [including approval of a subdivision map] are no greater than those specifically granted by the permit itself." (*Id.* at p. 866.) Here, the planning commission's approval of the proposed conversion did no more than give the developer (Thomas Shelton Powers, M.D., Inc.) a right to convert the apartment units to condominiums on condition that they then be sold as low- or moderate-income housing. We find nothing in the planning commission's approval, nothing in the facts stipulated to by the parties, and nothing in the record which could be interpreted as a promise by San Francisco to refrain from imposing restrictions on future transactions; i.e., on resales of those units. The resales occurred after 1979, and thus were governed—and rendered illegal—by the amended code.

Defendants rely on the opinion in *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556] for the proposition that such rights as vest, vest at the time a tentative map is approved—here, May 1978. *Youngblood* was reaffirmed in *City of West Hollywood* v. *Beverly Towers, Inc.*, *supra*, 52 Cal.3d 1184, which held that, in accordance with the Subdivision Map Act (Gov. Code, § 66410 et seq.), a city may not impose conditions on condominium conversion after a developer secures all the necessary discretionary approvals and satisfies all the requirements established by state law. (52 Cal.3d at pp. 1191-1192, disapproving *Santa Monica Pines* insofar as it holds to the contrary.) In the present case, however, San Francisco did *not* impose any new conditions on the condominium conversion, and the amendment, as noted, had no effect whatever on the rights of the developer to convert and sell the units. Accordingly, no vested rights were affected by the 1979 amendment, which affected only the post-1979 resale rights.

Finding that the 1979 version of San Francisco's Subdivision Code controlled the transactions at issue, we need not and do not address the second issue raised in the cross-appeal: that "the 1975 version of [Subdivision Code] section 1385 is void for vagueness and uncertainty."

## THE APPEAL

The trial court determined that the defendants violated San Francisco's Subdivision Code and that those violations were unfair business practices

(Bus. & Prof. Code, § 17000 et seq.)[5] San Francisco, however, contends that the trial court erred in limiting the number of violations to seven, and in finding that it lacked power to grant relief beyond an injunction and the imposition of statutory penalties.

*The Number of Violations*

■ Seven of the eight units were resold in violation of San Francisco's Subdivision Code. The trial court thus reasonably determined that there had been seven unfair business practices. San Francisco argues that the court should have found yet another unfair practice in the bulk sale of the units by Thomas Shelton Powers, M.D., Inc., to 560 Presidio, Inc. That sale, however, was itself permissible. That it led to an unfair business practice does not require the finding that it was such a practice itself.

*The Scope of Available Relief*

■ San Francisco's complaint sought, among other things, restitution, disgorgement of profits and an order requiring defendants to provide moderate-income housing in San Francisco equal to that removed from the city's housing stock by defendants' unfair business practices. The court, however, determined that it had no power to grant such relief and limited the remedy granted to the statutory penalty of $2,500 per unfair practice[6] plus an injunction against any similar practice by the defendants.

We find that the court was not required to so limit its remedy and that the statutory remedies for unfair business practices contemplate the type of relief sought by San Francisco.

Section 17203 permits injunctive relief: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Section 17204 permits prosecution of a 17203 action by a district attorney such as San Francisco's district attorney.

---

[5]Unless otherwise indicated, all further references to a code section will be to the Business and Professions Code.

[6]"Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by . . . any district attorney . . . ." (§ 17206, subd. (a).)

Although there are few cases which have examined the remedies sanctioned by section 17203, there is little question but that the broad range of remedies provided for therein includes restitution and/or disgorgement of profits. The statute itself expressly entitles a court to take such actions as may be necessary to prevent the use by any person of any unfair business practice, and to restore to any person in interest any property acquired by means of such a practice. Further, although there appears to be no case which has decided if restitution and disgorgement may be ordered in an action brought pursuant to section 17203, it is settled that such remedies are proper in an action brought for false advertising, also an unfair practice.[7]

In *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51], the court found disgorgement to be a proper remedy under section 17535, noting that by the statute's language, "the Legislature obviously intended to vest the trial court with broad authority to fashion a remedy that would effectively 'prevent the use . . . of any practices which violate [the] chapter [proscribing unfair trade practices]' and deter the defendant, and similar entities, from engaging in such practices in the future. The requirement that a wrongdoing entity disgorge improperly obtained moneys surely serves as the prescribed strong deterrent." (*Id.* at p. 450.) In so holding, the court, citing both state and federal cases, reaffirmed a policy against permitting a defendant to retain any profits gained by means of an unfair business practice: "[I]nasmuch as '[p]rotection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society' [citation], we must effectuate the full deterrent force of the unfair trade statute. . . . We do not deter indulgence in fraudulent practices if we permit wrongdoers to retain the considerable benefits of their unlawful conduct. [¶] As one court has stated, 'The injunction against future violations, while of some deterrent force, is only a partial remedy since it does not correct the consequences of past conduct. To permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all

---

[7]Section 17535 provides that certain district attorneys may prosecute an action for injunctive relief and defines the type of action: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

profits flowing therefrom.' [Citations.] . . . [¶] [T]he basic equitable principles underlying section 17535 arm the trial court with broad discretionary power to order restitutionary relief . . . A court of equity may exercise its full range of powers 'in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved.' [Citation.] As we stated recently, 'Even in the absence of the specific authorization contained in section 17535, a trial court has the inherent power to order restitution as a form of ancillary relief.' [Citations.]" (*Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d at pp. 451-452, fn. omitted.)

It is thus abundantly clear that as a general rule a trial court, ruling on an unfair trade practice, has the power to order disgorgement and/or restitution as a form of relief ancillary to an injunction.[8] The remaining issue is whether there is something in the present case which excepts it from the general rule.

■ Defendants contend that disgorgement or restitution is not a proper form of relief where there is no "person" who is a cognizable victim of the unfair business practice. We disagree. There are cognizable victims of defendants' wrongful acts. Low- and moderate-income persons desiring to live in San Francisco have been deprived of seven opportunities to find affordable housing. Further, as demonstrated by the Subdivision Code, the people of San Francisco have a real interest in providing housing for low- and moderate-income persons, and thus supporting a heterogeneous population. Both groups are "persons" within the meaning of section 17203. The term as defined by section 17201, is sufficiently broad to cover a group of natural persons, or even a city of natural persons.[9]

■ More importantly, however, we find nothing in logic or in law supporting a theory that a wrongdoer should be entitled to retain its illegal profits simply because there is no cognizable direct victim to be made whole. Thus, even were we to accept defendants' argument that the "person" at issue is insufficiently definite for purposes of restitution, we would nonetheless find disgorgement to be authorized so that illicit profits may be disgorged to some entity or party in a position to use it to correct, as much as possible, the harm wrought by the unfair practice. As noted, the laws

---

[8]Defendants cite *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093 [257 Cal.Rptr. 655] for the proposition that damages may not be awarded in an action brought pursuant to section 17203. An order of restitution/disgorgement in a 17203 action is not an order of damages, and as San Francisco did not and does not seek damages in the present case, *Industrial Indemnity* is inapplicable.

[9]"As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (§ 17201.)

against unfair business practices were drafted in large part to prevent a wrongdoer from retaining the benefits of its illegal acts. That purpose would be frustrated if a party were entitled to retain its profits simply because it is difficult to specify the victim.

In *Market St. Ry. Co.* v. *Railroad Commission* (1946) 28 Cal.2d 363 [171 P.2d 875], presenting an analogous situation, a fund of money was established representing overcharges made by the railway company. Few patrons filed claims for refunds. The money, however, was not returned to the railway company—which clearly was not entitled to it. Rather, it was awarded to the City of San Francisco, which had recently purchased the railway and would use the funds to improve its services. (*Id.* at pp. 371-373.) "In equity and good conscience it would seem that the fund should be made available for the benefit of those who were compelled to submit to this unlawful exaction . . . ." (*Id.* at p. 372.)

A similar procedure was followed in *State of California* v. *Levi Strauss & Co.* (1986) 41 Cal.3d 460 [224 Cal.Rptr. 605, 715 P.2d 564]. There, the Attorney General had filed a class action on behalf of persons overcharged by Levi Strauss. The parties entered into a settlement agreement establishing a fund of money to be repaid to the relevant consumers. Many did not file claims and a substantial amount of money was left after legitimate claims had been paid. The court held that the equitable doctrine of *cy près* provided a solution. The doctrine, as applied to actions in which money was wrongfully obtained but cannot be paid to the direct victims, is called "fluid recovery."[10] "The propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action. [Citations.] Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. [Citation.] Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts." (*Id.* at p. 472.) The court found that fluid recovery permits several alternatives, including "earmarked escheat" such as occurred in *Market St. Ry. Co.* where the funds are distributed to a governmental body which uses them to ameliorate the effects of past harm and to reduce the risk of future harm. (*Id.* at pp. 473-474.)

Finally, in *People* ex rel. *Smith* v. *Parkmerced Co.* (1988) 198 Cal.App.3d 683 [244 Cal.Rptr. 22], an action brought pursuant to sections 17203 and

---

[10]The court in *Levi*, while discussing the doctrine of "fluid recovery" in connection with a class action, cited *Market St. Ry. Co.* as an early example of the method, noting that a class action was not involved in that case, thus recognizing that the doctrine is not confined to class actions. (*State of California* v. *Levi Strauss & Co.*, *supra*, 41 Cal.3d at p. 474.)

17206, undistributed funds representing illegal security deposits were ordered turned over to a residents' association. The order was upheld on appeal, thus permitting both restitution to the actual victims, and where that was impossible, disgorgement to an interested third party, finding, "[r]efunding the unclaimed securities to the organization for its use in representing the interests of the Parkmerced tenants is an appropriate disposition of the penalty funds." (198 Cal.App.3d at p. 693.)

Defendants point out that each of the above cases involved a situation different from that in the present case. In all three cited cases the direct victims were more cognizable than the victims in the instant action, as in each an improper charge was levied against specific persons. In addition, *Levi* was a class action and the fund in *Parkmerced*, although in fact representing disgorgement, was obtained as a civil penalty pursuant to section 17206.[11]

These distinctions, however, are irrelevant. The underlying rationale of each case is that the equities of the situation and the necessity for deterring future wrongful acts require that the wrongdoer be prevented from retaining the illegal profits. Given that the wrongdoer should not retain the profits, the question is to determine to whom the profits should go. Where it is possible to refund a direct victim, the victim will obtain that refund. Where it is not possible, the theory of fluid recovery permits an award of the funds to an interested third party. The cases did not turn on the ability to name specific persons as victims, but on the equities of preventing the defendant from benefiting from the illegal transaction and of reversing the harm of the wrongful act to the greatest extent possible. We see no reason to reach a different result here.

Defendants argue that a construction of section 17203, permitting "disgorgement to the State," renders the section unconstitutionally vague, apparently advancing a theory that one who commits a wrongful act should be made aware not only that it is wrong, but to whom restitution might later be made. We are aware of no authority supporting such a theory. Rather, "A statute will not be declared void as being indefinite if it contains 'a reasonably adequate disclosure of the legislative intent regarding an evil to be combatted in language giving fair notice of the practices to be avoided.'" (*People* v. *Hallner* (1954) 43 Cal.2d 715, 720 [277 P.2d 393]; *People* v. *Ali* (1967) 66 Cal.2d 277, 280 [57 Cal.Rptr. 348, 424 P.2d 932].) Nor can we agree that our construction of the statute in any way deprives defendants of

---

[11]The section permits calculation on a "per victim" basis. The civil penalty assessed by the trial court appeared to be the sum of the improper assessments divided by the number of persons improperly assessed. (198 Cal.App.3d at p. 692.)

property without notice. The property having been gained wrongfully, the defendant has no valid ownership interest in it.

▉▉▉ For all the reasons stated above, we find that the trial court improperly determined that it was limited in fashioning a remedy to the assessment of civil penalties pursuant to section 17206. We do not here determine if defendants in fact obtained illegal profits. That is a question for the trial court, as is the question of the proper disposition of illegal profits, if any there be. We hold only that the court erred in determining that it *lacked the power* to enforce any remedy other than a preventative injunction and statutory penalties.

The judgment is reversed insofar as it denies the state further injunctive relief. In all other respects the judgment is affirmed. The action is remanded to the superior court for further proceedings consistent with our opinion. Costs are awarded to the People.

Strankman, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied February 3, 1992.