[No. B154768. Second Dist., Div. Four. Jan. 30, 2003.]

CITY OF WEST HOLLYWOOD, Plaintiff and Appellant, v.
1112 INVESTMENT COMPANY et al., Defendants and Appellants.

[REDACTED]

**COUNSEL**

Michael Jenkins, City Attorney; Richards, Watson & Gershon and T. Peter Pierce for Plaintiff and Appellant.

Law Offices of Rosario Perry and Michael Anderson for Defendants and Appellants.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This appeal involves application of the rent control ordinance enacted by the City of West Hollywood (City). The pertinent facts are undisputed and were presented to the trial court in the form of a stipulation. The legal dispute is whether two apartment buildings owned by respondents are subject to City's rent control law.

Prior to City's incorporation in 1984, respondent owners had received all required state approvals to convert their two buildings into condominiums. In *City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184 [278 Cal.Rptr. 375, 805 P.2d 329] (*Beverly Towers*), a majority of our state Supreme Court held City could not apply a subsequently enacted ordinance requiring apartment owners to obtain a conditional use permit for a condominium conversion when the owners had all obtained necessary state permits prior to City's incorporation. Here respondent owners never sold any units as condominiums but instead continued to use the buildings as apartment rentals. Each respondent owner also allowed one of the necessary state approvals for conversion it had obtained—a public report from the Department of Real Estate (Department)—to lapse although each eventually obtained a renewed public report.

This litigation arose when City brought an action against respondent owners for charging rents in violation of its local rent control ordinance.

Respondent owners defended on the basis of a state law that essentially precluded application of local rent control laws to a unit that could be sold as a condominium. City retorted respondent owners' units were no longer capable of being sold as condominiums because (1) the public reports had lapsed; (2) the lapse of the public reports meant respondent owners had lost whatever rights *Beverly Towers* had given them to be free of the additional requirements City had imposed on condominium conversions, including obtaining a conditional use permit; (3) respondent owners had failed to comply with City's requirement of obtaining conditional use permits; (4) respondent owners' failures to obtain the conditional use permits meant their units were no longer capable of being sold as condominiums; and (5) therefore respondent owners could not rely on the condominium exemption to rent control found in state law.

Based upon a statement of stipulated facts, the trial court granted summary judgment to respondent owners. In a nutshell, it found the lapse of the public reports did not require respondent owners to now comply with City's requirement(s) for condominium conversion. We reach a contrary conclusion. We will hold respondent owners' failures to timely renew the public reports resulted in a lapse or expiration of their right to be free from City's regulation(s). Because respondent owners have not complied with City's requirement of obtaining conditional use permits as a condition precedent to condominium conversion, the units in their buildings are not alienable within the meaning of state law. The units are therefore subject to the local rent control ordinance. Before we reach that conclusion, we first will reject City's contention that an amendment to the state rent control law enacted after summary judgment was granted that limits the condominium exemption to units sold to bona fide purchaser applies to this case.

LEGAL BACKGROUND ·

In 1984, West Hollywood incorporated as a city. In 1985, City adopted regulations governing the conversion of apartment houses into condominiums. One of the new requirements was that the building owner obtain from City a conditional use permit before the conversion could be approved. Litigation arose between City and apartment building owners who, *before* City had become incorporated, had obtained "final subdivision tract maps from the County to convert their existing rental units into condominiums, and, pursuant to a public report issued by the Department of Real Estate, secured approval for the sale of such condominiums." (*Beverly Towers, supra,* 52 Cal.3d 1184, 1188.) The issue was whether City could apply its newly enacted requirements to those owners who had not yet sold a single unit as a condominium. (*Id.* at p. 1190.)

City first argued that because no units had yet been sold, the conversion process had not yet been completed so that it could impose additional requirements on the property owners. The Supreme Court disagreed. It held it was "irrelevant" whether the owners had sold a unit before City adopted its regulation(s) because the owners had already obtained all the approvals required to convert to a condominium. (*Beverly Towers, supra,* 52 Cal.3d at p. 1190.)

Based upon "principles of fairness," a five-person majority of the Supreme Court held that where, as in that case, "a developer secures all state approvals to convert and the only remaining act required to complete the conversion is to convey title to a single unit," City could not impose new requirements. (*Beverly Towers, supra,* 52 Cal.3d at pp. 1190 & 1191.) In particular, it held "that local agencies [such as City] cannot enforce condominium conversion regulations enacted after a developer secures final subdivision map approval and permission from the Department of Real Estate to sell." (*Id.* at p. 1191.) Consequently, the requirement of obtaining a conditional use permit could not be applied to apartment owners who had already received all necessary approvals under the state regulatory scheme. The court expressly overruled its earlier decision in *Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858 [201 Cal.Rptr. 593, 679 P.2d 27] to the extent it had held "a city may impose conditions on condominium conversion after a developer has secured all the necessary discretionary approvals and satisfied all the requirements established by state law." (*Beverly Towers, supra,* 52 Cal.3d at p. 1192.)

### FACTUAL BACKGROUND

This case involves two apartment buildings in City. One is located at 625 North Flores Street and is owned by respondent E. D. Flores Corporation. The other is located at 1112 North Olive Drive and is owned by respondents 1112 Investment Corporation, LLC, and Melvin J. Remba, as trustee of the Melvin J. Remba Family Trust. Prior to City's 1984 incorporation, respondent owners had obtained all approvals required by state law to convert their two buildings into condominiums: final subdivision maps and the issuance of public reports by Department. Consequently, the buildings could have been converted into condominiums without complying with any of City's newly imposed requirements, including the application for and issuance of a conditional use permit by City. However, for reasons not explained in the record, respondent owners continued to maintain the buildings as apartments.

The public report issued by Department in regard to condominium conversions is valid for only five years. (Cal. Code Regs., tit. 10, § 2795.3.) The

issuance of the report is governed by Business and Professions Code sections 11010-11024. This statutory scheme is a consumer protection measure "intended primarily to prevent 'fraud and sharp practices' by requiring disclosure of all relevant information to potential purchasers and lessees of subdivision lots in a project of five or more units. [Citations.] The focus [of the scheme] is not to provide ongoing supervision or regulation of the marketing and operation of the project, but rather to ensure that its standards are met by means of a prereport review [citations]." (*Beverly Towers, supra,* 52 Cal.3d 1184, 1189, fn. 3.)

In regard to the building at 625 North Flores Street, Department's initial report expired on November 6, 1988. Respondent owner of that building did not request a renewed report until five years later. Department issued a renewed report on November 19, 1993. The renewed report expired on November 18, 1998. Once again respondent owner failed to request an immediate renewal. Department did not issue a second renewed report until 11 months later on October 8, 1999. That report will not expire until October 7, 2004. Only one unit has been sold as a condominium in this building. That sale occurred on July 12, 2000, after this litigation began, and was to Melvin J. Remba, one of the respondent owners of the other building involved in this litigation.

In regard to the building at 1112 North Olive Drive, Department's initial report expired on March 9, 1987. Within a month, Department issued a renewed report which expired on April 1, 1992. Approximately six months after the expiration of the renewed report, Department issued a second renewed report on September 22, 1992. That report expired five years later but a third renewed report was not issued until slightly more than two years later on October 5, 1999. That report is still in effect and will not expire until October 4, 2004. Apparently one condominium unit in this building was sold after June 2000. The details of this transaction are not set forth in the record.

The bone of contention in this case is whether pursuant to state law the two buildings are exempt from City's rent control ordinance. In that regard, the relevant state law is the Costa-Hawkins Rental Housing Act. (Civ. Code, §§ 1954.50-1954.535.) The law became effective on January 1, 1996. Pertinent to this case is Civil Code section 1954.52, subdivision (a), which exempts certain units from local rent control laws. The subdivision lists three exemptions, only one of which could apply to this case. It exempts a dwelling or unit if "[i]t is alienable separate from the title to any other dwelling unit or is a subdivided interest in a subdivision, as specified in subdivision (b), (d), or (f) of Section 11004.5 of the Business and Professions Code." (Civ. Code, § 1954.52, subd. (a)(3)(A).)

Respondent owners claimed this exemption applied to them. They interpreted it to mean that as long as a unit in the building could be sold as a condominium, the rent control law did not apply. They relied upon the fact that prior to City's incorporation in 1984, they had received all required state approvals to convert the apartments into condominiums. Consequently, they charged rents in excess of that authorized by City's rent control law.

In June 2000, City filed suit against respondent owners, alleging that commencing in 1999, each had charged rents in violation of its rent control law. City sought injunctive relief to prohibit them from imposing and collecting rents exceeding that authorized by law and to require them to refund to the tenants the excess rent collected. City also sought declaratory relief that "at least one dwelling unit [in each building] be conveyed" as a condominium unit before the owners could claim the exemption in the Costa-Hawkins Act. (The record does not disclose why City did not earlier bring an action.)[1]

As already noted, one month after City filed its complaint, one unit in the 625 North Flores Street building was conveyed to one of the respondent owners of the 1112 North Olive Drive building. In addition, one unit was sold in the 1112 North Olive Drive building after City filed suit.

The parties ultimately filed cross-motions for summary judgment. In July 2001, the trial court granted respondent owners' motion. It ruled:

"City of West Hollywood v. Beverly Towers, Inc[.], 52 Cal 3d 1184 [, *supra*,] is the controlling authority. In this case the Defendants [the owners of the two buildings] obtained all necessary p[er]mits and complied with all statutory requirements to convert their apartments to condominiums before Plaintiff[] [City] enacted its local ordinances. Pursuant to Beverly Towers the Defendants are exempt from the local regulations.

"The plaintiff argues that the defendant is required to obtain a conditional use permit because they allowed the Public Report to expire before the subsequent renewal. This fact, they argue, distinguishes this case from Beverly Towers. Given [the] purposes and requirements for a Public Report the court does not feel that the defendant's failure to renew before the expiration causes them to lose their exemp[t] status.

---

[1]City's brief states, without any citation to the record: "The City . . . adopted rent control regulations after its incorporation[.] Respondent landlords largely *ignored those regulations* by increasing rents far in excess of the maximum allowed. In 1999, when the rent increases spiraled out of control, it came to the City's attention that respondent landlords were claiming that their buildings really were not apartment buildings, but had been condominium buildings all along, even though respondent landlords had not sold one unit at the time."

"The purpose of a Public Report is to provide complete and full disclosure of statutorily required information to buyers. The term of the Report is 5 years and renewal is mandatory if the required information is submitted. If the State grants the renewal, the fact that this information is submitted before or within a reasonable time after the expiration of the 5 years would not make any difference in whether or not the Public Report accomplished its purposes."

The trial court denied respondent owners' subsequent motion for attorney fees.

After the trial court granted summary judgment to respondent owners, the Legislature amended Civil Code section 1954.52, subdivision (a), the provision upon which they had relied to claim exemption from City's rent control law. It now provides the exemption does *not apply* to a "condominium dwelling or unit that has not been sold separately by the subdivider to a bona fide purchaser for value. . . ." (Civ. Code, § 1954.52, subd. (a)(3)(B)(ii).) One of the issues on this appeal is whether or not the amendment applies to this case.

This appeal by City challenges the trial court's grant of summary judgment to respondent owners. We review that ruling under the independent review standard. We "independently determine the construction and effect of the facts presented to the trial judge as a matter of law." (*Rosse v. DeSoto Cab Co.* (1995) 34 Cal.App.4th 1047, 1050 [40 Cal.Rptr.2d 680].)

The cross-appeal by respondent owners challenges the denial of their motion for attorney fees. The cross-appeal is rendered moot by our reversal on the merits of the summary judgment granted in their favor. Because they are no longer the prevailing parties, there is no need to discuss whether the trial court properly interpreted the law to deny them attorney fees.

## Discussion

A. *The Amendment to Civil Code Section 1954.52 Does Not Apply to This Case*

The trial court granted summary judgment to respondent owners in July 2001. In September 2001, the Legislature amended Civil Code section 1954.52. Previously the statute had exempted from rent control "a dwelling or unit" that "is alienable separate from the title to any other dwelling unit." (Civ. Code, § 1954.52, subd. (a)(3).) The new law now provides the exemption does not apply to a "condominium dwelling or unit that has not been sold separately by the subdivider to a bona fide purchaser for value." (Civ. Code, § 1954.52, subd. (a)(3)(B)(ii).) The Governor signed the bill in October 2001. The amendment, which had been introduced in February 2001 as a non-urgency measure, took effect on January 1, 2002.

 City contends the amendment applies to this case. City concedes the general rule that a statute is given *prospective effect* but nonetheless relies upon the principle that an amendment that merely *clarified as opposed to changed the law* can apply to actions predating its enactment. If City is correct, respondent owners violated City's rent control law because the rental units had not been sold to bona fide purchasers for value; only such a sale would exempt the unit from the reach of City's rent control regulation.

To support its argument, City has provided this court with the legislative history to this amendment, Senate Bill No. 985.[2] As we explain below, these documents support a contrary conclusion: the amendment constitutes a change to the law, not a clarification of the law and therefore cannot be applied to this case.

Under the heading of *"Changes* to Existing Law," the analysis by the Senate Committee on the Judiciary on Senate Bill No. 985 (2001-2002 Reg. Sess.) as amended April 2, 2001, explains at page 2: *"Existing law,* the Costa-Hawkins Rental Housing Act, authorizes owners of residential real property to establish the initial and all subsequent rental rates for certain dwellings or units, including units that are 'alienable separate from the title to any other dwelling unit (condominiums). [¶] *This bill* would apply this exemption to condominium units that have been sold separately by the subdivider to a bona fide purchaser for value." (Italics added.) The "Comment" section in this analysis reads: *"Stated need for modification of Costa-Hawkins exemption for condominiums* [¶] SB 985 would revise the condominium exception in the Costa-Hawkins Act to only apply to a condominium unit that 'has been sold separately by the subdivider to a bona fide purchaser for value.' [¶] According to the sponsor, this amendment is necessary to close a loophole in law that allows landlords to avoid local rent control laws. The exemption was originally created to spur construction of condominiums, seen as an affordable housing alternative, and in recognition that condominiums were built with the same purpose as apartment units. However, the language was broadly written and, as a consequence, some apartment property owners have taken advantage of the law by obtaining a permit to convert to condominiums, but never completing the process. In the meanwhile, the property owners continue to rent the apartment units, free from local rent controls because of the Costa-Hawkins exemption. In some cases, proponents assert, the condo-conversion permits were pulled up to eight years ago, but the owners are still renting the units to tenants. [¶] The bill would close the loophole and provide that the exemption would apply only when the unit is sold separately to a bona fide purchaser for value. Thus, apartment units

---

[2]City filed a request we take judicial notice of the tendered legislative history. Respondent owners did not oppose that request. We granted the request.

that have remained rentals would be subject to local rent control laws. This is only fair, asserts the sponsor. [¶] In opposition, the [Small Property Owners of San Francisco] asserts that this bill would deprive an owner of market rents to which he or she is entitled under current law [and] . . . that expanding the scope of rent control will surely discourage developers from building new units in rent control jurisdictions. The proponents of [Senate Bill] 985 respond that the opposition arguments simply do not acknowledge the reality that many apartment owners have abused the Costa-Hawkins exemption to avoid local rent controls. Otherwise, why haven't the units been separately sold to third parties instead of being rented out to tenants at uncontrolled rents?" (*Id.* at pp. 4-5.)

The Assembly Committee on Judiciary report on Senate Bill No. 985 (2001-2002 Reg. Sess.) as amended May 17, 2001, contained an analysis identical to that stated above.

After the Legislature passed the bill and sent it to Governor Davis for signature, its author (Senator Sheila James Kuehl) wrote the Governor: "[T]he bill closes a loophole in Costa-Hawkins that allows landlords to . . . raise rents by falsely 'preparing' to convert a rental unit to a condominium. Under [Senate Bill] 985, in cities that have rent control, the landlord would be required to actually sell a unit, rather than merely initiate the conversion paperwork, in order to have rent controls removed."

Our Supreme Court recently explained the governing principles of statutory interpretation. ■ "A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so. [Citations.] A statute has retrospective effect when it substantially changes the legal consequences of past events. [Citation.] . . . [¶] A corollary to these rules is that a statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment. We assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law. [Citation.] Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning. [Citations.] Such a legislative act has no retrospective effect because the true meaning of the statute remains the same." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507].)

■ Giving due consideration to these principles and analyzing the three cases relied upon by City, we conclude the amendment to Civil Code section 1954.52 is not a clarification of existing law but, instead, is a change to the law. Consequently, it can be given only prospective effect.

The legislative history supplied by City contains multiple references to closing a "loophole" in the law. ■ A loophole is defined as "[a]n ambiguity, omission, or exception (as in a law or other legal document) that provides a way to avoid a rule without violating its literal requirements; esp., a tax-code provision that allows a taxpayer to legally avoid or reduce income taxes." (Black's Law Dict. (7th ed. 1999) p. 954, col. 2.) ■ By amending the statute to close the loophole, the Legislature sought *to change* the law to prevent landlords from taking advantage of an exception which the supporters of the bill concluded did not further the policy behind the law. In addition, the fact the opponents characterized the amendment as an expansion of the scope of the rent control law that would deprive a property owner of a rent to which he or she was otherwise entitled under current law indicates the purpose of the amendment was to amend and change the law, not merely to clarify it.

Because a statute is considered to have retrospective effect if its application would "substantially change[] the legal consequences of past events," e.g., the rents charged by respondent owners in previous years (*Western Security Bank v. Superior Court, supra,* 15 Cal.4th 232, 243), we conclude City's argument that the statute merely clarifies the law lacks merit. To apply the amendment to respondent owners in this case would substantially change the legal consequences of their past actions: the rents they charged in previous years. In other words, were we to accept City's invitation to apply the amendment to this case, we would be giving the amendment retrospective effect. The Legislature did not indicate its intent to do that. The amendment had been introduced as a non-urgency measure and took effect on January 1, 2002.

The three cases City relies upon do not support a contrary conclusion.

The first, *Union League Club v. Johnson* (1941) 18 Cal.2d 275 [115 P.2d 425], does not even embody the principle upon which City relies; instead it merely includes in dicta a passing reference to the principle. The case involved payment by a social and political club of sales tax on liquor and meals served to its members and guests. The state Treasurer urged the club was a business within the meaning of the governing tax law. The law defined a business to be " 'any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit or advantage, either direct or indirect.' " (*Id.* at p. 277.) The club argued it was not a business because it was a nonprofit corporation. The Supreme Court first rejected that argument, relying upon the plain language of the statute which "does not include the word 'profit' in its definitions." (*Id.* at p. 278.) The court explained that even if the club did not realize any profit from its dining room and bar operations, the club realized a "gain, benefit or advantage" from these

operations within the meaning of the taxing statute because the dining room and bar attracted and retained members for the club. (*Ibid.*) The court then rejected the club's fallback position that because the Legislature had since "expressly amended the statute to impose a tax upon social clubs, [the] court should construe the former law as not including them." (*Ibid.*) The court recognized the club's argument was "based upon the general rule that courts ordinarily assume from a new enactment, a legislative purpose to change the existing law" but then noted it was probably wanting "in view of the fact that at the time this amendment was made, social clubs were resisting the collection of sales taxes, a legislative intent to clarify rather than to change the law, *may well be inferred.*" (*Id.* at pp. 278-279, italics added.) This equivocal statement is dicta that was not necessary to resolution of the appeal. The court had already resolved the question against the club based upon the clear language of the governing tax statute.

City's reliance upon *W. R. Grace & Co. v. Cal. Emp. Com.* (1944) 24 Cal.2d 720 [151 P.2d 215] is similarly misplaced. The case involved claims for unemployment insurance benefits. After the claims had been presented the law was amended to provide that "during the waiting period the claimant must be eligible for benefits in virtually all respects." (*Id.* at p. 729.) The question was whether that provision applied to the claimants before the court. The court held that "[n]o question of retroactive interpretation of the amendment is . . . involved" (*id.* at p. 730) because by amending the law, "the Legislature intended simply to clarify the law [citations], since even before the amendment the eligibility requirements for the payment of benefits were properly applicable to the waiting period. [Citations.] The various disqualifications on eligibility for benefits imposed by the act then in effect clearly indicate that they were intended to apply as well to the waiting period. . . . [T]he disqualification imposed . . . . also applied to the waiting period even before the statute specifically so provided." (*Id.* at p. 729.) In other words, the Supreme Court concluded it was clear the amendment was a mere clarification of the law because even before its passage the eligibility requirements for unemployment insurance applied during the waiting period. This case is distinguishable. Prior to the amendment to Civil Code section 1954.52, there was no statutory provision or judicial decision that held the rent control exemption only applied to the condominium unit if sold to a bona fide purchaser for value. It is therefore apparent the amendment to Civil Code section 1954.52 constituted a change in the law.

Last, City relies upon *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450 [118 Cal.Rptr.2d 118], which held a statutory amendment to be a clarification of existing law. The case is clearly distinguishable. In fact, it demonstrates the fallacy of City's argument that the amendment of Civil Code section 1954.52 is merely a clarification of existing law.

As the Court of Appeal noted, *Renee J.* "has a unique history in the annals of California jurisprudence." (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th at p. 1455.) The litigation commenced when the parent filed a writ petition in the Court of Appeal. The case involved interpretation of portion of a statute (Welf. & Inst. Code, § 361.5, subd. (b)(10)), which governed denial of reunification services to a parent in a dependency proceeding. The Court of Appeal interpreted the statute in a manner favorable to the parent. The Supreme Court granted review and reached a contrary result. The Supreme Court's opinion expressly acknowledged it may have incorrectly interpreted the statute. It wrote: "If we have failed to discern correctly the Legislature's intent in enacting the statute, that body *may clarify the statute accordingly.*" (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 749 [110 Cal.Rptr.2d 828, 28 P.3d 876], italics added.) Within three weeks, a bill was introduced in the Legislature to amend the statute. The legislative history of the bill indicates the amendment was a response to the Supreme Court's opinion and was meant to clarify the Legislature's intent when it had first enacted the statutory provision at issue. (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th 1450, 1457-1458.) The bill was quickly passed and signed into law as an urgency measure by the Governor.

In subsequent trial court proceedings, the parent sought a writ to compel the trial court to apply the amended version of the statute to her case. The Court of Appeal agreed with the parent. It found the amendment was a clarification of the law which should be applied to all open cases, including the parent's. The Court of Appeal reasoned: "[T]here has been no change in the law. According to the Supreme Court's own analysis, [the statutory provision] was ambiguous as previously written. The court ascribed a meaning to it, but only by attempting to discern what policies the Legislature would have been most concerned about in enacting it. Moreover the court specifically invited the Legislature to 'clarify' it. Under these circumstances, we have no choice but to conclude that the Legislature intended to do just that: *clarify.*" (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th 1450, 1463.)

In this case, the Legislature's amendment of Civil Code section 1954.52 arose in completely different circumstances. There had been no judicial interpretations of the earlier version of the statute. There had been no judicial statement the earlier version was ambiguous. There had been no judicial invitation to legislative action. Instead, there was a statute which had been in effect for over five years. The Legislature amended the statute to change the law to "close a loophole" based upon several years of experience with the law as then written. There was no legislative statement of a mere intent to clarify an earlier legislative intent. In sum, the amendment to Civil

Code section 1954.52 was not for the purpose of either clarifying preexisting law or making express the original legislative intent. (Cf. *City of Redlands v. Sorensen* (1985) 176 Cal.App.3d 202, 211-212 [221 Cal.Rptr. 728].) The amendment sought to change the law and therefore can only be applied prospectively.

This analysis disposes of City's contention that "alienable" in the pre-2002 version of Civil Code section 1954.52, subdivision (a)(3) "referred to a unit that *already had been sold* and not to a unit that was simply *capable of being sold* by virtue of all of the precondominium conversion paperwork having been completed." Until the 2001 amendment took effect, there was no requirement that the unit be sold; all that was required was that it was capable of being sold as a condominium. Whether or not the units in respondent owners' buildings were capable of being sold is a question that requires interpreting *Beverly Towers, supra*, 52 Cal.3d 1184. We now turn to that issue.

B. *Beverly Towers No Longer Applies to This Case*

 As explained earlier, *Beverly Towers, supra,* 52 Cal.3d 1184, 1190-1192, held City could not impose its newly enacted requirement of obtaining a conditional use permit to property owners who had already complied with the state requirements of obtaining final map approval and issuance of a public report. At the time of City's incorporation, respondent owners had already met all state requirements in regard to the two buildings at issue. Consequently, City could not require them to obtain conditional use permits before *completing* the conversion process. The issue is whether City can *now* impose that requirement. If City can, and it is undisputed respondent owners have *not* obtained conditional use permits, then the units are not alienable and the exemption from rent control found in former Civil Code section 1954.52, subdivision (a)(3), the law in effect at the time City initiated this action, does not apply. As we now explain, respondent owners lost whatever rights they had under *Beverly Towers* when they permitted the initial public reports required by Department to expire. Consequently, City can properly apply its requirements to them before the conversion process can be completed.

In regard to a property owner's right to proceed with development based upon a vested right, if the approvals which form the basis of the vested right have expired prior to the project's commencement, any vested right has likewise lapsed or been abandoned. (See, e.g., *Court House Plaza Co. v. City of Palo Alto* (1981) 117 Cal.App.3d 871, 887 [173 Cal.Rptr. 161] [The "permits expired without [the developer's] having built in accordance with their terms. [The developer] cannot six years later assert that it continues to

have a vested right to the expired permit."] and *Oceanic California, Inc. v. North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57, 75 [133 Cal.Rptr. 664] [appellate court agrees with trial court's finding that because the tentative map approvals " 'have since expired, any possible vested rights obtained by [the developer] have lapsed or been abandoned' "].)

In *Beverly Towers,* our Supreme Court never held the apartment building owners had obtained a vested right to convert to condominiums. This point caused some consternation to the dissent which believed that the majority's holding was undermining established law. (*Beverly Towers, supra,* 52 Cal.3d at pp. 1195-1200 (dis. opn. of Broussard, J.).) In particular, the dissent wrote: "The majority silently erode the vested rights doctrine when they confer what can only be termed a vested right to develop without requiring any showing of detrimental reliance." (*Id.* at p. 1200.)

Consequently, the majority opinion is apparently grounded on a holding that something short of a vested right precluded City from imposing any further requirements on the apartment building owners before the conversion process could be completed. Given, as set forth above, that a vested right to build or develop can lapse or expire based upon failure to proceed, it follows that whatever right respondent owners gained by *Beverly Towers* can likewise expire or lapse. This conclusion is consistent with the "principles of fairness" which guided the *Beverly Towers* court in creating what was, in effect, an exception to the vested rights doctrine. (*Beverly Towers, supra,* 52 Cal.3d at pp. 1190, 1193-1194.) While it was fair to prevent City from imposing any new requirements upon a developer who had obtained all necessary state approvals for conversion, it is also fair to conclude that a developer who allows one of those approvals to lapse or expire can now be subject to City's new requirements.

In this case, the right expired or lapsed because the public reports expired before either respondent owner obtained a renewal. As explained earlier, respondent owner of 625 North Flores Street waited five years after the 1988 expiration of the original public report to obtain a renewed report and almost a year after the expiration of the renewed report to obtain another one. In regard to 1112 North Olive Drive, respondent owners waited various periods (one month, six months, and two years) before obtaining renewed reports after the previous report expired. Respondent owners concede that during the expiration period(s), they were precluded from selling a unit.

Respondent owners attempt to avoid the force of this conclusion by minimizing the significance of the public report. They disdainfully characterize the public report as a "white sheet" or "white slip." Respondent owners' approach is not persuasive.

For one thing, the language used by the *Beverly Towers* court indicates that the issuance of the public report was one of the predicates to its holding that City could impose no further requirements. For instance, the court stated the issue in the case was whether "City can impose additional conditions on [the building owners'] right to convert even after they have obtained final subdivision tract map approval under the Map Act, met the requirements of the Common Interest Development Act, *and obtained a final report granting the right to subdivide from the Department of Real Estate* under the Subdivided Lands Act"; the court stated it agreed with the property respondent owners' contention that "they are exempt from the ordinance [to require issuance of a conditional use permit] because at the time it was enacted they had secured final subdivision map approval *and permission from the California Department of Real Estate* to sell individual units in their buildings as condominiums"; the court noted that "final map approval *and issuance of the public report* were the last approvals defendants needed to sell a unit as a condominium; they did not require any further discretionary permits"; and the court held "that local agencies cannot enforce condominium conversion regulations enacted after a developer secures final subdivision map approval *and permission from the Department of Real Estate to sell.*" (*Beverly Towers, supra,* 52 Cal.3d 1184, 1189-1190, 1187, 1192, and 1191, italics added.)[3]

Furthermore, respondent owners' argument underestimates the significance of the public report. The sale of five or more condominiums requires a public report. (Bus. & Prof. Code, § 11018.2.) ■ The policy underlying this requirement is consumer protection by requiring full disclosure of all relevant information. (*Beverly Towers, supra,* 52 Cal.3d at p. 1189, fn. 3; *Drake v. Martin* (1994) 30 Cal.App.4th 984, 992, 995 [36 Cal.Rptr.2d 704].) One practice guide explains the focus "is to protect purchasers of subdivision interests from fraud or misrepresentation during the developer's initial construction and sales period. [Citations.] This regulatory objective is implemented primarily through the requirement that a developer obtain a public report . . . before offering interests in the development for sale to the public. A developer must submit a detailed application that includes most of the project documents for [Department's] review to confirm that the developer has complied with the Department's minimum standards for operating, financing, and documenting the development. [Citations.]" (Sproul & Rosenberry, Advising Cal. Condominium and Homeowners Associations (Cont.Ed.Bar 1991) Statutory & Regulatory Framework, § 1.25, p. 23.)

---

[3]The decisions from the Courts of Appeal which have discussed *Beverly Towers* have also noted the significance of the fact the owners had obtained the public report. (See, e.g., *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1178 [118 Cal.Rptr.2d 15]; *Consaul v. City of San Diego* (1992) 6 Cal.App.4th 1781, 1799 [8 Cal.Rptr.2d 762]; *People v. Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330, 338 [3 Cal.Rptr.2d 34].)

Business and Professions Code section 11010, subdivision (b) sets forth more than a dozen subjects to be covered in the application for the public report. Business and Professions Code section 11018 sets forth nine grounds upon which the application for a pubic report can be denied. If denied, the developer is entitled to a hearing before the Real Estate Commissioner. (Bus. & Prof. Code, § 11018.3.) If issued, the public report is valid for only five years. (Cal. Code Regs., tit. 10, § 2795.3.)[4] The public report must be given to a prospective buyer before a sales contract is executed. (Bus. & Prof. Code, § 11018.1, subd. (a).)

A developer who sells without obtaining a public report is subject to criminal sanctions (Bus. & Prof. Code, § 11023) and to being enjoined pursuant to a cease and desist order until a public report has been obtained. (Bus. & Prof. Code, § 11019; *Cal-Am Corp. v. Department of Real Estate* (1980) 104 Cal.App.3d 453, 459 [163 Cal.Rptr. 729, 6 A.L.R.4th 1281].) In addition, a developer's failure to comply with the statutory scheme renders the sales contract voidable at the option of the purchaser; the purchaser can either "affirm the agreement and perform according to its terms or . . . declare the agreement void and recover the sums paid less any allowable offsets." (*Drake v. Martin, supra,* 30 Cal.App.4th 984, 992, and cases cited therein.)

 In light of the above, we cannot agree with either respondent owners' suggestion or the trial court's conclusion that, after the initial public report has expired, any request for a renewal is a simple ministerial matter so that their failure to make such a request in a timely manner is of no consequence. The breadth of the statutory scheme, including the remedies available for noncompliance, demonstrates that obtaining a public report is a significant step in gaining approval of a condominium conversion project. The same can be said for renewing such a report. For instance, California Code of Regulations, title 10, section 2795.3 specifically provides: "A renewal shall be issued if the subdivider, owner or agent makes application for renewal of any report *and has submitted such additional information as the commissioner may require.*" (Italics added.) And the application for the initial public report states, under the heading "When to Apply": "If the subdivision will not be sold out during the term of the final subdivision public report, application for a renewal of the report should be submitted approximately *six months prior to the report['s]* expiration date."[5] (Italics added.) Taken together, the administrative rule and the direction to give

---

[4] California Code of Regulations, title 10, section 2795.3 provides: "The term of any Final Subdivision Public Report issued pursuant to Section 11018 of the Business and Professions Code shall be limited to five (5) years."

[5] A sample of the application was submitted to the trial court and is included in the record on appeal.

Department six months to process the renewal application demonstrate the process is not simply a perfunctory one.

Nor do we find any merit to respondent owners' argument that Department's renewal of the public reports established they are not required to comply with City's requirement of obtaining a conditional use permit. Respondent owners point to the fact that Business and Professions Code section 11018, subdivision (c) provides the Department will not issue the public report if there is an "[i]nability to deliver title or other interest contracted for." They therefore argue that by issuing them the renewed public reports, Department determined they could deliver title to the sellers and that this determination is a sub silentio finding they were not required to obtain conditional use permits. This argument is not persuasive. For one thing, as respondent owners concede, lack of a conditional use permit is not a basis to deny a public report. For another thing, respondent owners have failed to establish that Department is conversant with or required to be conversant with local zoning laws in reviewing applications for public reports. The reality is that City had no input into the process when respondent owners requested renewals of the public reports. City therefore had no opportunity to argue the pertinent legal point: the prior expirations of the first public reports now required respondent owners to comply with City's regulations enacted after incorporation. Consequently, Department's issuances of renewed public reports is not the pragmatic equivalent of a finding (entitled to preclusive effect) that respondent owners do not now have to obtain conditional use permits.

To summarize, whatever rights respondent owners had based upon *Beverly Towers* lapsed when the first public reports expired without a renewal having been obtained. City could therefore impose the new requirement of a conditional use permit to the conversion process. Because respondent owners have not obtained a conditional use permit, the individual units are not "alienable" within the meaning of the rent control exemption in Civil Code section 1954.52, subdivision (a)(3). The fact respondent owners sold one unit in each building does not alter that conclusion; they were required to obtain conditional use permits but did not do so. As such, their buildings are still subject to City's rent control law so that City may properly bring an action against them for violation of its local ordinance.

Our conclusion comports with one of the policies underlying *Beverly Towers*: safeguarding the investments and expectations of owners who intended to convert apartment buildings to condominiums. (*Beverly Towers, supra,* 52 Cal.3d 1184, 1190.) In this matter, respondent owners' investments and expectations were safeguarded because City could not impose any further requirements before the conversion process could be completed.

Respondent owners were free to sell the units as condominiums and complete their projects. For whatever reason(s), they failed to do so. Throughout an almost 20-year period, they continued to utilize the buildings as apartment rentals with no indication they ever intended to actually convert the structures into condominiums. And most significantly, each failed to take the step necessary to preserve that right; they did not seek timely renewals of the public reports prior to the reports' expiration. Instead, they allowed the reports to lapse for various periods of time.

It is obvious that the application of *Beverly Towers* contemplates a legitimate enterprise to develop and sell residential property. Here, however, respondent owners have been engaged in a charade to continue in the apartment rental business, not an enterprise to convert and sell apartment units as condominiums. *Beverly Towers* was meant to be a shield for a developer to protect it when City sought to impose additional requirements for condominium conversion after all state approvals had been obtained; it was never meant to be a sword to attack City's rent control ordinance when an owner had allowed the right granted by *Beverly Towers* to lapse. We cannot believe that Justice Mosk, writing for the majority in *Beverly Towers,* anticipated an apartment building owner would attempt to periodically rollover the right to be free of City's requirements in order to avoid City's rent control ordinance. Justice Mosk's holding in *Beverly Towers* was simply an attempt to accommodate those who had legitimately complied with all state law requirements for condominium conversion in preparation of selling their units and leaving the apartment rental business.

We therefore come to the proper disposition of this matter. We will reverse the trial court's grant of summary judgment in favor of respondent owners and direct it to deny that motion. This will render moot the issue raised by respondent owners' cross-appeal: did the trial court err in denying them attorney fees as the prevailing parties? We will remand for the court to conduct further proceedings on City's motion for summary judgment consistent with the views expressed herein. As City concedes, it will be necessary for it to submit evidence of the precise amount of rental overcharges made by respondent owners after the trial court granted summary judgment. In addition, the parties need to address the fact one unit was sold in each building after this litigation was commenced. City's reply brief, citing *Beverly Towers, supra,* 52 Cal.3d 1184, 1188-1189, footnote 1, states: "Even though respondents have sold units in their buildings without obtaining the requisite CUPs [conditional use permits], it does not necessarily follow that a reversal of the trial court's judgment would void those sales. The City

could issue CUPs after-the-fact if respondents would ever file CUP applications."[6] Respondent owners have presented no analysis on this point. We express no opinion on the issue.[7]

DISPOSITION

In regard to the appeal prosecuted by plaintiff, the City of West Hollywood, the summary judgment granted in favor of defendants is reversed and the matter is remanded to the trial court for proceedings consistent with the views expressed herein. The cross-appeal prosecuted by defendants is dismissed as moot. The City of West Hollywood is to recover its costs on the appeal and cross-appeal.

Hastings, J., and Curry, J., concurred.

A petition for a rehearing was denied February 25, 2003, and the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied April 23, 2003.

---

[6]In its opening brief, City wrote: "The City is *not* asserting here that the fact Mr. Remba purchased the unit somehow negates the sale."

[7]After we filed our opinion, we permitted an attorney who claims to represent nonparty homeowners associations at the two buildings to file a letter brief. In a conclusory fashion and without any supporting documentation, he alleged that since 2000, "three units out of eight units have been sold" at 1112 North Olive Drive and "14 units out of 21 units have been sold" at 625 North Flores Street "to good faith purchasers." This claim is not supported by the record on appeal. The parties' statement of stipulated facts, presented to the trial court in June 200*1*, indicates that only one unit in each building had been sold. The parties' appellate briefs also proceeded upon that factual assumption, as did our opinion. Nonetheless, based upon the dubious factual assertion that there have been multiple bona fide sales transactions, counsel for the homeowners' associations urges our opinion "divests each condo unit owner of their vested property rights." Not so. As we indicated above, the effect of our opinion on any present owners of condominium units in the two buildings is an issue to be addressed in further trial court proceedings. City's answer to the petition for rehearing reiterates, "City is not unsympathetic to those concerns," and "City's goal is *not* to interfere with the rights of those individuals who purchased units from respondents after the City initiated this litigation; the City's goal is to require respondents to obtain a CUP and to comply with the City's rent control regulations." We construe this to be a concession by City it will not interfere with any bona fide sales consummated before our opinion was filed on January 30, 2003. To the extent the purchaser-owners have legitimate concerns about the validity of the title conveyed to them, their most obvious recourse is an action against respondent owners given that their petition for rehearing concedes they "sold 14 units in one building and 3 units in the other project since the trial court's judgment in reliance thereon." This lawsuit is not the proper forum to resolve those concerns.

To the extent respondent owners rely upon our Supreme Court's very recent opinion in *Gardner v. County of Sonoma* (2003) 29 Cal.4th 990 [129 Cal.Rptr.2d 869, 62 P.3d 103] to urge our opinion is incorrect, we simply observe that case has no relevance to the issues raised on this appeal.